FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 1 2 2010

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| WENDY N. JENKINS, ELEANOR SPRATLIN CRAWFORD, *each Plaintiff individually, and on behalf of all Georgia residents similarly situated.* )))))) | |
| Plaintiffs, )))) | CASE NO. |
| )) | **CIVIL COMPLAINT FOR DAMAGES** |
| vs. )))) | **PLAINTIFFS DEMAND TRIAL BY JURY** |

*CAP*

McCALLA RAYMER, LLC, THOMAS A.
SEARS, ESQ., INDIVIDUALLY, AS AN
OFFICER OF MORTGAGE  ELECTRONIC
REGISTRATION SYSTEMS, INC, AS AN
OFFICER OF WELLS FARGO, AND AS
AN EMPLOYEE OF McCALLA RAYMER)
CHARLES TROY CROUSE, ESQ., aka C.
TROY CROUSE ESQ., INDIVIDUALLY,
AS AN OFFICER OF MORTGAGE
ELECTRONIC REGISTRATION
SYSTEMS, INC, AS AN OFFICER OF
WELLS FARGO AND AS AN EMPLOYEE)
OF McCALLA RAYMER, MERSCORP
INC., BANK OF AMERICA, N.A., BAC
HOME LOANS SERVICING, LP., fka
COUNTRYWIDE HOME LOANS
SERVICING, LP.,WELLS FARGO BANK,
 N.A., PROMMIS SOLUTIONS, LLC.,
PROMMIS SOLUTIONS HOLDING INC.,
GREAT HILL PARTNERS, INC.,
 MORTGAGE ELECTRONIC
REGISTRATION SYSYTEMS INC.
AMERICA'S SERVICING COMPANY,
TAYLOR BEAN &WHITAKER,
CRYSTAL WILDER, INDIVIDUALLY,
 AS NOTARY PUBLIC AND AS AN
 EMPLOYEE OF McCALLA RAYMER,
 ELIZABETH LOFARO, INDIVIDUALLY,)
AS NOTARY PUBLIC AND AS AN
 EMPLOYEE OF McCALLA RAYMER,

**1 10· CV- 3732**

JUDGE _____

CHIQUITA RAGLIN, INDIVIDUALLY,   )
AS NOTARY PUBLIC AND AS AN   )
 EMPLOYEE OF McCALLA RAYMER,   )
VICTORIA MARIE ALLEN,   )
INDIVIDUALLY, AS NOTARY PUBLIC   )
 AND AS AN EMPLOYEE OF McCALLA )
 RAYMER, IRIS GISELLA BEY,   )
INDIVIDUALLY, AS NOTARY PUBLIC   )
 AND AS AN EMPLOYEE OF McCALLA )
 RAYMER, JAMELA REYNOLDS,   )
INDIVIDUALLY, AS NOTARY PUBLIC   )
 AND AS AN EMPLOYEE OF McCALLA )
 RAYMER AND LATASHA DANIEL,   )
INDIVIDUALLY, AS NOTARY PUBLIC   )
 AND AS AN EMPLOYEE OF McCALLA )
 RAYMER   )
   )
   )
Defendants.   )

COMES NOW, Plaintiffs, Wendy N. Jenkins and Eleanor Spratlin Crawford, by and through the undersigned counsel, and complains as follows:

## **INTRODUCTION:**

1.    In this Class Action Complaint, Plaintiff(s) seek, *inter alia,* the injunction of various foreclosure and eviction proceedings, for themselves and other similarly situated, based upon the Defendant's routine failure to comply with statutory prerequisites to foreclosure.  Plaintiffs and the class they seek to represent also seek a determination of the validity of foreclosure

sales held in violation of statutory requirements, together with damages and other relief.

2.   Georgia has longstanding, statutorily prescribed non-judicial procedures by Power of Sale with minimal consumer protections for homeowners. O.C.G.A. § 44-14-162 et seq.  Homes are routinely foreclosed upon pursuant to the statutory Power of Sale without a pre-foreclosure hearing.

3.   The law is clear, however, that entities foreclosing upon homeowners must <u>strictly</u> comply with Georgia's statutory prerequisites to foreclosure. O.C.G.A. § 23-2-114.  Among other things, it is black letter law that the entity seeking to foreclose must have actual legal authority to exercise the Power of Sale.

4.   In recent years, many foreclosing entities, including Defendants have dispensed with this fundamental requirement.  Such entities foreclose, through their Counsel, without having first obtained proper and legally valid assignment of the mortgage and the power of sale on property they purport to foreclose.

5.   Georgia's foreclosure process has become an undisciplined and lawless rush to seize homes.  Many thousands of foreclosures are plainly void under statute and Georgia case law. Many

borrowers never obtain accurate statutorily required notices, have flawed and fraudulently created assignments of title and thus are sold and, sometimes, resold without a proper chain of title.

6.   Plaintiffs in this matter seek relief for the Defendant's wrongful foreclosure practices and actions.  They seek declaratory and injunctive relief concerning foreclosures conducted by entities who do not hold the Power of Sale, injunction of eviction action pending procedures to verify the validity of underlying sales, injunction of upcoming sales where there is no proof of assignment, cancellation of fees and costs for invalid sales processes and damages.

7.   Plaintiffs seek such relief on their own behalf and on behalf of all Georgia property owners similarly situated.

## JURISDICTION AND VENUE

8.   The Court has subject matter jurisdiction over this action pursuant to federal question under 18 U.S.C.A. §§1961-68, 18 U.S.C.A. §1343 and 28 U.S.C. §1331; 12 U.S.C. §§2605-2608, and 15 U.S.C. §1692.

9.     Diversity subject matter jurisdiction exists over this class-action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"), amending 28 U.S.C. §1332, at new subsection (d), conferring federal jurisdiction over class action involving (a) 100 or more members of the proposed Class; (b) at least some members of the proposed class members have different citizenship from some Defendants and (c) the claims of the proposed class members exceed the sum or value five million dollars ($5,000,000) in aggregate. 28 U.S.C. §1332(d)(2) and (6).

10.    Venue is proper in the Northern District of Georgia, Atlanta Division pursuant to 28 U.S.C. §1391 and 18 U.S.C. §1965(a), in that Defendants systematically conduct and transact substantial business in this state and District, as licensed attorneys at the Bar in Georgia and licensed banks and corporations organized and operating in the State of Georgia, the causes of action occurred in this District as Plaintiff Wendy Jenkins resides in Columbus, Georgia and Plaintiff Eleanor Spratlin Crawford resides in Marietta, Georgia.

## PARTIES

11.   Plaintiff Wendy N. Jenkins is a married woman, over the age of majority and competent to bring this action, residing at 7372 Cedar Creek Loop, Columbus, GA 31904.

12.   Plaintiff Eleanor Spratlin Crawford is a married woman, over the age of majority and competent to bring this action, residing at 3149 Saddleback Mountain Rd., Marietta, GA 30062

13.   Defendant McCalla Raymer, LLC (hereinafter "McCalla Raymer") is a law firm incorporated in the state of Georgia, their principal place of business is 1544 Old Alabama Road, Roswell, GA, 30076-2012.  McCalla Raymer acting for and on the behalf of its' clients Bank of America, BAC Home Loans Servicing, Wells Fargo and Chase Bank, N.A. has instituted and pursued non-judicial foreclosures of Georgia Security Deeds against the property of Plaintiffs described above with full knowledge that it lacked authority to do so, and has imposed similarly illegal foreclosures upon thousands of similarly situated residents of Georgia.  Defendant continues to prosecute such foreclosures against citizens of Georgia.

14. Defendant Thomas A. Sears, Esq. is a licensed attorney practicing at the Bar in the State of Georgia. He is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

15. Defendant Charles Troy Crouse, Esq. aka C. Troy Crouse, Esq. is a licensed attorney practicing at the Bar in the State of Georgia. He is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

16. Defendant MERSCORP Inc.(hereinafter "MERSCORP") conducts business as an electronic loan registry for the mortgage finance industry, their principal place of business is 1595 Spring Hill Road, Suite 310, Vienna, Virginia 22182..

17. Defendant Bank of America, N.A. (hereinafter "Bank of America") is a federally chartered bank, their principal place of business is 401 North Tryon St., Charlotte, NC 28255-0001.

18. Defendant BAC Home Loans Servicing, LP, f.k.a. Countrywide Home Loans, LP (hereinafter "BAC") is a wholly owned subsidiary of Bank of America NA, and conducts business as a

mortgage servicer, their principal place of business is 4500 Park Granada, Calabasas, CA 91302.

19.   Defendant Wells Fargo Bank, N.A. (hereinafter "Wells Fargo") is a federally chartered bank, their principal place of business is 101 N. Phillips Avenue, Sioux Falls SD 57104.

20.   Defendant Prommis Solutions LLC, (hereinafter "Prommis")  is a document preparation company working with mortgage servicers and law firms with large mortgage default resolution practices, its principal place of business is 400 Northridge Road Atlanta, Georgia 30350.

21.   Defendant Prommis Solutions Holding Corporation (hereinafter "Prommis Holding Corp.") is a Holding Corporation, incorporated in Delaware, which owns multiple companies, each of whom provides some aspect of foreclosure, bankruptcy, loss mitigation, and loan settlement processing service, tax examination, title search, and other document management services.  Prommis' companies provide outsourced foreclosure processing services in 18 states and bankruptcy processing services in all 50 states.  Their principal place of business is 400 Northridge Rd. Atlanta, GA 30350

22.   Defendant Great Hill Partners, LLC (hereinafter "Great Hills") is a private equity firm, incorporated in Massachusetts, who owns two-thirds of Prommis Solutions Holding Corporation. Great Hill Partners, LLC's principal place of business is One Liberty Square Boston, Massachusetts 02109.

23.   Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS") is a wholly owned subsidiary of MERSCORP, incorporated in Delaware, operating an electronic registry designed to track servicing rights and ownership of mortgage loans.  Their principal place of business is 1818 Library Street, Suite 300, Reston, VA, 20190.

24.   Defendant America's Servicing Company (hereinafter "ASC") is the fictitious name of Wells Fargo Home Mortgage, Inc., which is a wholly owned subsidiary of Wells Fargo & Company, whose principal place of business is 101 N. Phillips Avenue, Sioux Falls SD 57104.

25.   Defendant Taylor Bean and Whitaker (hereinafter "TBW") was a correspondent mortgage lender who closed its doors on August 5, 2009, and subsequently filed for Chapter 11 Bankruptcy

protection in the Middle District of Florida, Jacksonville Division, on August 24, 2009.

26.     Defendant Crystal Wilder is a Notary Public who is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

27.     Defendant Elizabeth Lofaro is a Notary Public who is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

28.     Defendant Chiquita Raglin is a Notary Public who is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

29.     Defendant Victoria Marie Allen is a Notary Public who is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

30.     Defendant Iris Gisella Bey is a Notary Public who is an employee of McCalla Raymer and conducts business at their

principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

31. Defendant Jamela Reynolds is a Notary Public who is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

32. Defendant Latasha Daniel is a Notary Public who is an employee of McCalla Raymer and conducts business at their principal place of business which is 1544 Old Alabama Road, Roswell, GA, 30076-2012.

33. Defendants' wrongful acts, as hereinbelow alleged in greater detail, took place within and throughout the State of Georgia.

34. The Defendants,[1] and each of them, were the agents, employees, representatives, partners, officers, principals and/ or joint venturers of each of the remaining defendants, and in doing the things hereinafter alleged, were acting within the scope, course and purpose of such agency, employment or position, or within the apparent scope, course and purpose of such agency,

---

[1] Whenever appearing in this complaint, each and every reference to Defendants or to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them, unless said reference is specifically qualified.

employment or position and with permission and consent of each of the remaining defendants.

## FACTS

### PLAINTIFF WENDY JENKINS

**35.** On or about July 3, 2008, Plaintiff Jenkins executed a Note and Security Deed, in favor of Taylor Bean and Whitaker due to a refinancing of the subject Property.

36. During the course of payment of the note by Plaintiff Jenkins, TBW, BAC and/ or Does, and their alleged predecessor(s) have repeatedly and willfully acted fraudulently in that they have improperly added fees to the balance of the loan, improperly credited and/or misapplied payments to the principal balance of the note and refused to provide documentation or legal justification for the debt, the fees or the irregular amortization of the principal.  In addition, they have refused payment and repeatedly returned Plaintiff's attempts to tender payment. Plaintiff Jenkins had set up electronic payments, taken directly from her checking account, to pay her mortgage payments to TBW. Unbeknownst to her, TBW abruptly closed its doors on

August 5, 2009, and subsequently filed for Chapter 11

Bankruptcy protection in the Middle District of Florida,

Jacksonville Division, on August 24, 2009.  Plaintiff Jenkins

continued to make payments to TBW which were not

credited to her mortgage.

37.  Specifically, on May 29, 2009, an electronic debit in the

amount of $1400.00 was made to TBW.

38.  Specifically, on June 15, 2009, an electronic debit in the

amount of $500.00 was made to TBW.

39.  Specifically, on August 3, 2009, an electronic debit in the

amount of $1500.00 was made to TBW.

40.  Specifically, on August 17, 2009, an electronic debit in the

amount of $1000.00 was made to TBW.

41.  Specifically, on September 30, 2009, an electronic debit in

the amount of $1880.00 was made to Bank of America.

42.  Plaintiff has asked repeatedly, and Defendants TBW and

Bank of America have refused, repeatedly, to clarify whether

<u>any</u> of those payments had been properly credited to Plaintiff Jenkins' mortgage.

43.   Bank of America accepted multiple payments from Plaintiff and then, on April 4, 2010, returned a payment of $2000.00 which had been made on April 1, 2010.

44.   Defendants BAC, TBW and/or Does 1-100 have repeatedly refused to properly credit payments in an effort to manufacture a default in order to fraudulently foreclose on Plaintiff's home. Defendants have **adamantly refused to identify the secured creditor and the Real Party in interest,** which would allow Plaintiff to tender and make payments on her home.  Furthermore, they have misled the Plaintiff as to obtaining the information as to obtaining the information for payoff.

45.   Plaintiff Jenkins is, and was, understandably concerned that she may never see any credit for the monies paid, due to the very public allegations of fraud, by the SEC on the part of the management of TBW, which culminated in the arrest of the former CEO and principal owner of the privately held TBW, Jamie Farkas.  See:

http://www.sec.gov/news/press/2010/2010-102.htm

46.    Defendants maintained in their "Verified Answer" (Exhibit
       "A") that Plaintiff Jenkins' request for proof that Bank of
       America has an actual pecuniary interest in the debt
       instrument is a ruse to evade payment of the mortgage note.
       Nothing could be further from the truth.  Plaintiff has
       attempted, in good faith, to make her payments, and in fact
       has tendered monies that have disappeared into the quagmire
       that is the TBW bankruptcy.  These monies, totaling
       $3400.00, have not been credited to her mortgage by either
       TBW or Bank of America.

47.    At some time unknown to Plaintiff Jenkins, the Note and
       security deed were bifurcated where the deed alone was
       separated from the note and was assigned, for servicing
       purposes, to Defendants "BAC", and/or Does. It is unknown
       who presently owns and holds the actual "wet ink" original
       promissory Note. Based upon knowledge and belief, the
       promissory note has been pledged, hypothecated, and/or
       assigned as collateral security to an unknown entity, foreign

trust, or to an agency of the United States government or the Federal Reserve.

48.   By letter dated March 26, 2010, counsel for BAC (McCalla Raymer) affirmatively represented that its "client" was, in fact, Defendant BAC and that BAC, was both the servicer and the "secured creditor" for the aforementioned alleged indebtedness regarding the property. Said correspondence, however fails to identify BAC as the owner and holder of the Note, and fails to affirmatively represent that BAC owns and holds any interest in the Security Deed or has any rights therein or thereto which would support a foreclosure of the Property.

49.   Notwithstanding the letter of March 26, 2010, to Plaintiff Jenkins from McCalla Raymer said Defendant confirmed, in its  letter, that BAC is merely the servicer of the loan and that the alleged note holder, was possibly "Bank of America" and not the originating lender.

50.   McCalla Raymer, which provided Plaintiff with written notice that their "client" for purposes of the loan and foreclosure sale was BAC is the same law Firm which also

fraudulently and affirmatively represented that the entity
that had full authority to negotiate, amend, and modify all
terms of the mortgage instrument for purposes of the subject
loan and foreclosure sale was "Bank of America", who is
also a "client".

51.   Upon knowledge and belief the Note and Security Deed are
or were part of a securitized mortgage transaction where the
Security Deed and Note were, at some point after original
execution by the Plaintiff, severed and sold, assigned,
pledged, hypothecated or transferred to separate entities, with
certain rights being sold separately.

52.   The servicing rights to the Note were sold separately or
obtained by the liquidation of TBW to BAC and/or Does,
however, BAC has not established both the existence of the
mortgage and mortgage note, or ownership of the note and
mortgage. The Plaintiff has requested the proof of
ownership and even sent a Qualified Written Request, as
allowed under the Real Estate Settlement and Procedures
Act, to Defendants "BAC", Bank of America and McCalla
Raymer.  They, each and every one, have refused to

provide proof thereof and answer Plaintiff's questions.

53.   The admissions of record demonstrate that Defendant
"BAC" has no legal or equitable interests in both the Note
and Security Deed which are a legal prerequisite to institute
and maintain a foreclosure, and that such interests may in
fact lie with one or more of Defendants DOE(S).

54.   As a severance of the ownership and possession of the
original Note and Security Deed has occurred and as the true
owner and holder of both the original Note and Security
Deed are unknown and as a result of multiple and/or missing
assignments and an incomplete and improper chain of title
via written admissions set forth above, <u>all</u> defendants named
above are legally precluded from foreclosing and/or selling
the subject property.

55.   Defendant McCalla Raymer's foreclosure sale notice letter is
not in accordance with notice provisions involving
foreclosure proceedings as required under Georgia law.
Specifically, O.C.G.A. § 44-14-162.2 requires, in pertinent
part, that *"notice ... shall include the name, address, and
telephone number of the individual or entity who shall have the*

*full authority to negotiate, amend, and modify all terms of the mortgage with the debtor".* Upon knowledge and belief, <u>ONLY</u> a vested investor, in a securitized trust, who is the real party in interest, may authorize amendments and/or modification of the Plaintiff's note and security deed.

56.   Furthermore, O.C.G.A. § 7-6A-2 (6) prescribes that *"A creditor shall not include: (A) a servicer; (B) an assignee; (C) a purchaser; or (D) any state or local housing finance agency or any other state or local governmental or quasi-governmental entity."*

57.   The letter of counsel for BAC dated March 26, 2010 (Exhibit "B") fails to comply with the notice provisions of O.C.G.A. § 44-14-162 (b) *"The security instrument or assignment thereof vesting the secured creditor with title to the security instrument shall be filed prior to the time of sale in the office of the clerk of the superior court of the county in which the real property is located."* as said letter does not indicate who the secured creditor is; nor does identify the secured creditor who has title to the security instrument but instead recites that the assignment is <u>"to be recorded"</u> in the Office of the Clerk of Muscogee County, Georgia.

58.   As such, Defendant BAC is without standing and is legally precluded from foreclosing on and selling the Property.

59.   In an attempt to cure the deficiencies noted supra, Defendants McCalla Raymer, Prommis Solutions and MERS have caused a purported assignment (Exhibit "C") from MERS to BAC to be recorded upon the Public Records of Muscogee County on April 14, 2010.

60.   On or about May 3, 2010, Plaintiff Jenkins filed suit in the Superior Court of Muscogee County which was styled SU-10-CV-1731.

61.   Defendants McCalla Raymer and Defendants Prommis Solutions, failed to answer in the statutorily required time and entered into default.

62.   On or about October 8, 2010, Defendants McCalla Raymer and Defendants Prommis Solutions filed a "Motion to Open Default and Memorandum of Law in Support Of".

63.   On or about October 8, 2010, Defendants McCalla Raymer and Defendant Prommis Solutions simultaneously filed their "Verified Answer to Plaintiff's Suit" with their "motion to Open Default".

64.   In her original complaint, which is re-alleged herein Plaintiff Jenkins asserted that the purported assignment recorded in the Muscogee County Property records was deficient upon its face as the Defendants:

a) purport to have executed the assignment (Exhibit "C") on February 2, 2010, which was a full three (3) months prior to the "sale" date and that there was no logical way that anyone could know with a certainty that a foreclosure sale would definitely occur on May 4th, 2010 therefore the alleged date of execution is suspect if not fraudulent.

b) The signatures on the assignment are suspect as they are illegible, Plaintiff Jenkins provided an example of the signature of Charles Troy Crouse's signature on his own Security Deed (Exhibit "D") as showing that the illegible mark is wildly different than the "known" signature on the Security Deed for his own home.

c) In addition, when looking at the signatories for this assignment, it is abundantly clear that once pen was set upon paper to "sign" the documents, it never left the paper. There is an illegible squiggle above the signature line for "C. Troy Crouse" as "Vice President" for MERS which then travels in an unbroken line directly to the signature line for "Thomas Sears" acting as "Assistant Secretary" for MERS, which again, results in an illegible squiggle.

65.   In their "Verified Answer", Defendants McCalla Raymer and

Prommis Solutions attempted to defend their fraudulent actions

in regards to the Assignment by presenting documents *See*

*generally* *Answer* which they claim gave Attorneys Crouse and

Sears, among others, the Authority to sign as Officers of MERS.

These documents, just like the Assignment, have been

manufactured to fabricate the appearance of propriety and to

mislead the court into thinking that these attorneys, their

"clients", their employers and associated entities were all acting

in good faith.  These baldly fraudulent attempts to lull the court

into thinking that the actions taken were done with all the rights

and authority required by Georgia law, fail upon their face, just

like the purported Assignment.

66.   The barest, most cursory, glance at the dates of these purported

authorizations reveals that the so-called "Agreement for Signing

Authority" and "Corporate Resolution" by and between

Defendants MERS, Bank of America and McCalla Raymer

were supposedly executed approximately two and a half months

(2.5) **AFTER**  the Assignment in question was purportedly

executed.  Specifically, the alleged Assignment purports to have

been executed on February 2, 2010, and the "Agreement for Signing Authority" and "Corporate Resolution" by and between Defendants MERS, Bank of America and McCalla Raymer purports to have been executed on April 21, 2010, which is **Seventy Eight (78) days <u>after</u>** the purported date of execution indicated on the recorded Assignment.

67.   Nothing in either the "Agreement for Signing Authority" or "Corporate Resolution" by and between Defendants MERS, Bank of America and McCalla Raymer gives Defendants Crouse, Sears, McCalla Raymer, or Prommis Solutions the authority to execute ANY documents prior to April 21, 2010, let alone the Assignment that purports to transfer Plaintiff Jenkins' property.

68.   Likewise, the barest, most cursory glance at the dates of these purported authorizations reveals that the so-called "Agreement for Signing Authority" and "Corporate Resolution" by and between Defendant MERS, BAC and McCalla Raymer were supposedly executed approximately two and a half months (2.5) **AFTER** the Assignment in question was purportedly executed.

Specifically, the alleged Assignment purports to have been executed on February 2, 2010, and the "Agreement for Signing Authority" and "Corporate Resolution" by and between Defendants MERS, Bank of America and McCalla Raymer purports to have been executed on April 26, 2010 which is **Eighty Three (83) days <u>after</u>** the purported date of execution indicated on the recorded Assignment.

69. Nothing in either the "Agreement for Signing Authority" or "Corporate Resolution" by and between Defendants MERS, BAC and McCalla Raymer gives Defendants Crouse, Sears, McCalla Raymer, or Prommis Solutions the authority to execute ANY documents prior to April 26, 2010, let alone the Assignment that purports to transfer Plaintiff Jenkins' property.

70. Close examination of each of these fraudulent "Agreement for Signing Authority" and "Corporate Resolution" documents reveals that they were not signed at all, but rather that a stamp with, what Defendants fraudulently represent to be the "signature" of William Hultman as "Secretary/Treasurer" and Sharon Horstkampf as "Vice President" of MERS, was applied to each and every document where a signature was needed.

71. Defendants also present "Agreement for Signing Authority" and "Corporate Resolution" documents by and between MERS, Countrywide Financial Corporation and McCalla Raymer. It is common knowledge that Countrywide is a defunct entity and as such cannot maintain any contract.

72. There is no language in the "Agreement for Signing Authority" or "Corporate Resolution" that confers either of these contracts the ability to survive the demise of Countrywide. In fact, the "Agreement for Signing Authority" contract expressly provides at Paragraph 7 "Upon termination of the contract between Member and Vendor, this agreement shall concurrently terminate and the corporate resolution shall be revoked at such time."

73. Defendants McCalla Raymer and Prommis Solutions make much ado of having "complied" with the non-judicial foreclosure process in Georgia, all the while completely ignoring the fact that their client did not then, and does not now, have any standing to foreclose by virtue of having no

legally cognizable claim to the subject property.

74.    Defendant Bank of America argues that it is entitled to
foreclose by virtue of being a servicer, however, the Georgia
Legislature has specifically defined in O.C.G.A. 7-6A-2 (6)
that *"A creditor shall not include: (A) a servicer; (B) an
assignee; (C) a purchaser; or (D) any state or local housing
finance agency or any other state or local governmental or
quasi-governmental entity."* Therefore, Bank of America,
acting as a mere servicer and not being the secured creditor
cannot foreclose even, *assuming arguendo,* that the
Assignment was valid.

75.    It is abundantly clear that the Legislature, in specifying that
the "secured creditor" be upon the record prior to the sale
*see O.C.G.A. 44-14-162 (b)* meant for the creditor to be
vested with title to the any property it proposes to foreclose
upon **prior** to the sale.  Defendants argue that they have
satisfied the requirements of 44-14-162 (b) by causing the
alleged Assignment to be recorded.  Plaintiff specifically
avers that a fraudulently created Assignment confers no

rights at all, let alone the right to foreclose.

76. Indeed, O.C.G.A. § 44-2-43 declares *"Any person who: (1) fraudulently obtains or attempts to obtain a decree of registration of title to any land or interest therein; (2) knowingly offers in evidence any forged or fraudulent document in the course of any proceedings with regard to registered lands or any interest therein; (3) makes or utters any forged instrument of transfer or instrument of mortgage or any other paper, writing, or document used in connection with any of the proceedings required for the registration of lands or the notation of entries upon the register of titles; (4) steals or fraudulently conceals any owner's certificate, creditor's certificate, or other certificate of title provided for under this article; (5) fraudulently alters, changes, or mutilates any writing, instrument, document, record, registration, or register provided for under this article; (6) makes any false oath or affidavit with respect to any matter or thing provided for in this article; or (7) makes or knowingly uses any counterfeit of any certificate provided for by this article shall be guilty of a felony and shall be punished by imprisonment for not less than one nor more than ten years."*

## PLAINTIFF ELEANOR SPRATLIN CRAWFORD

77.   On or about August 11, 1997, Plaintiff Crawford executed a
      Note and Security Deed, in favor of NationsBank due to a
      refinancing of the subject Property.

78.   In 1998, NationsBank acquired BankAmerica Corporation,
      and the whole unit took on the name of Bank of America.

79.   At some time unbeknownst to Plaintiff Crawford, ASC
      acquired the servicing rights to the subject loan and began
      servicing the loan.

80.   Plaintiff Crawford admits that she was in arrears in regards
      to four months of mortgage payments in May of 2009.  This
      was due to having suffered four (4) deaths within four
      months within her immediate family.  She fell behind
      because of contributing to funeral and burial costs for her
      deceased family members.

81.   Plaintiff Crawford, being mindful of her obligations called
      ASC and obtained an amount to "cure" her default.  She was
      told that she had to make a payment Sixty Two Hundred
      dollars ($6200.00), which she was willing and able to pay

immediately.  When she attempted to make that payment to ASC, she was told that she had call McCalla Raymer and/ or Prommis Solutions.

82.  Plaintiff Crawford contacted McCalla Raymer in order to cure her default and was told to contact Prommis Solutions.

83.  Upon contacting Prommis Solutions, Plaintiff Crawford was given an inflated amount of **over double** the previously quoted amount of Sixty Two Hundred dollars ($6200.00). When she questioned the amount, she was told that it was due to "fees and costs associated with your foreclosure."

84.  These fees are inflated and improper under FDCPA 15 U.S.C. §1692K *et seq.*.

85.  On or about May 1st, 2010, Defendants McCalla Raymer sent Plaintiff Crawford a Notice of Sale Under Power, affirmatively representing that their "client" was Wells Fargo and that Wells Fargo had retained them to foreclose upon the subject property.

86.  On or about June 15, 2010, Plaintiff Crawford obtained a

certified copy of an Assignment purporting to transfer "all right and interest" in the subject property to from MERS to ASC, which is a fictitious name (DBA) of Wells Fargo.

87.    Said Assignment is patently defective and fails upon its face to transfer anything as it does not comply with O.C.G.A. § 44-14-64, and O.C.G.A. § 44-14-33 in that the Notary, Crystal Wilder had not been commissioned as a notary on the date of the purported execution of the Assignment.

88.    The Assignment purports have been executed on April 4, 2009. On that date, Ms. Wilder was not a Notary. Ms Wilder was not granted a Notary Commission until May 15, 2009.

89.    According to the Notary Index, which is searchable and available on the GSCCA website; Ms. Wilder had never been granted a Notary Commission, within the State of Georgia, previous to May 15, 2009. (Exhibit "E")

90.    Said Assignment was recorded upon the Land Records of Cobb County on June 23, 2009.

91.    Again, and similarly to Plaintiff Jenkins' assignment, the "Sale

Date" was approximately three (3) months after the Assignment purported to be executed.  Specifically, the "Sale Date" is indicated as being "7/07/2009" and the date of the purported execution of the Assignment was April 4, 2009.  One wonders again at the power of clairvoyance those at Prommis must possess to be able to know with a certainty that there would be no possible way for Plaintiff to "cure" any purported default and or refinance the home.

92.   On or about June 1, 2010, Plaintiff Crawford sought and obtained a Temporary Restraining Order to stay a pending foreclosure.  The court required a deposit into the Court's registry of $17,485.84 which Plaintiff Crawford deposited into the Court's registry.

93.   On or about September 24, 2009, Defendants sought to have the TRO lifted and sought to collect the funds deposited into the Court's registry by Plaintiff Crawford.

94.   Defendants continued to rely upon the fraudulent assignment when seeking to lift the TRO and to foreclose upon Plaintiff's property.

95.     On or about September 24, 2010, the Temporary Restraining
        Order was lifted.  It is not known to Plaintiff Crawford if the
        monies tendered into the court's registry have been paid out
        to Defendants and/ or their Counsel.

96.     On or about Oct 19, 2010, after having been sued, and while
        being in litigation with Plaintiff Crawford, Defendants
        caused another assignment to be recorded upon the Land
        Records of Cobb County.  This new Assignment is labeled
        "Amended Assignment" but it in fact "amends" nothing.  It
        is an obvious attempt to "fix" the fraudulent conveyance of
        the previous assignment.

97.     Plaintiff Crawford specifically avers that the assignment
        dated October 15, 2010 and recorded on October 19, 2010
        must be considered hearsay as it fails to meet the criteria
        required in order to qualify as a "Business Record" exempt
        from Hearsay Rules.

98.     The October Assignment was not made contemporaneously
        with any transfer of rights or interest, assuming *arguendo*
        that any transfer was valid.  Furthermore, this document was

obviously created in anticipation of litigation.

99.   Defendants BAC, TBW and/or Does 1-100 have repeatedly refused to properly credit payments in an effort to manufacture a default in order to fraudulently foreclose on Plaintiff's home. Defendants have **adamantly refused to identify the secured creditor and the Real Party in interest,** which would allow Plaintiff to tender and make payments on her home.  Furthermore, they have misled the Plaintiff as to obtaining the information as to obtaining the information for payoff.

100.   Plaintiff Jenkins is, and was, understandably concerned that she may never see any credit for the monies paid, due to the very public allegations of fraud, by the SEC on the part of the management of TBW, which culminated in the arrest of the former CEO and principal owner of the privately held TBW, Jamie Farkas.  See:
http://www.sec.gov/news/press/2010/2010-102.htm

101.   Defendants maintained in their "Verified Answer" (Exhibit "A") that Plaintiff Jenkins' request for proof that Bank of America has an actual pecuniary interest in the debt

instrument is a ruse to evade payment of the mortgage note.

Nothing could be further from the truth. Plaintiff has

attempted, in good faith, to make her payments, and in fact

has tendered monies that have disappeared into the quagmire

that is the TBW bankruptcy. These monies, totaling

$3400.00, have not been credited to her mortgage by either

TBW or Bank of America.

102.   At some time unknown to Plaintiff Jenkins, the Note and

security deed were bifurcated where the deed alone was

separated from the note and was assigned, for servicing

purposes, to Defendants "BAC", and/or Does. It is unknown

who presently owns and holds the actual "wet ink" original

promissory Note. Based upon knowledge and belief, the

promissory note has been pledged, hypothecated, and/or

assigned as collateral security to an unknown entity, foreign

trust, or to an agency of the United States government or the

Federal Reserve.

103.   By letter dated March 26, 2010, counsel for BAC (McCalla

Raymer) affirmatively represented that its "client" was, in

fact, Defendant BAC and that BAC, was both the servicer and the "secured creditor" for the aforementioned alleged indebtedness regarding the property. Said correspondence, however fails to identify BAC as the owner and holder of the Note, and fails to affirmatively represent that BAC owns and holds any interest in the Security Deed or has any rights therein or thereto which would support a foreclosure of the Property.

104. Notwithstanding the letter of March 26, 2010, to Plaintiff Jenkins from McCalla Raymer said Defendant confirmed, in its  letter, that BAC is merely the servicer of the loan and that the alleged note holder, was possibly "Bank of America" and not the originating lender.

105. McCalla Raymer, which provided Plaintiff with written notice that their "client" for purposes of the loan and foreclosure sale was BAC is the same Law Firm which also fraudulently and affirmatively represented that the entity that had full authority to negotiate, amend, and modify all terms of the mortgage instrument for purposes of the subject loan and foreclosure sale was "Bank of America", who is

also a "client".

106.   Upon knowledge and belief the Note and Security Deed are or were part of a securitized mortgage transaction where the Security Deed and Note were, at some point after original execution by the Plaintiff, severed and sold, assigned, pledged, hypothecated or transferred to separate entities, with certain rights being sold separately.

107.   The servicing rights to the Note were sold separately or obtained by the liquidation of TBW to BAC and/or Does, however, BAC has not established both the existence of the mortgage and mortgage note, or ownership of the note and mortgage. The Plaintiff has requested the proof of ownership and even sent a Qualified Written Request, as allowed under the Real Estate Settlement and Procedures Act, to Defendants "BAC", Bank of America and McCalla Raymer.  They, each and every one, have refused to provide proof thereof and answer Plaintiff's questions.

108.   The admissions of record demonstrate that Defendant "BAC" has no legal or equitable interests in both the Note and Security Deed which are a legal prerequisite to institute

and maintain a foreclosure, and that such interests may in fact lie with one or more of Defendants DOE(S).

109. As a severance of the ownership and possession of the original Note and Security Deed has occurred and as the true owner and holder of both the original Note and Security Deed are unknown and as a result of multiple and/or missing assignments and an incomplete and improper chain of title via written admissions set forth above, all defendants named above are legally precluded from foreclosing and/or selling the subject property.

110. Defendant McCalla Raymer's foreclosure sale notice letter is not in accordance with notice provisions involving foreclosure proceedings as required under Georgia law. Specifically, O.C.G.A. § 44-14-162.2 requires, in pertinent part, that *"notice ... shall include the name, address, and telephone number of the individual or entity who shall have the full authority to negotiate, amend, and modify all terms of the mortgage with the debtor"*. Upon knowledge and belief, ONLY a vested investor, in a securitized trust, who is the real party in interest, may authorize amendments and/or modification of the

Plaintiff's note and security deed.

111.   Furthermore, O.C.G.A. § 7-6A-2 (6) prescribes that *"A creditor
shall not include: (A) a servicer; (B) an assignee; (C) a
purchaser; or (D) any state or local housing finance agency or
any other state or local governmental or quasi-governmental
entity."*

112.   The letter of counsel for BAC dated March 26, 2010 (Exhibit
"B") fails to comply with the notice provisions of O.C.G.A. §
44-14-162 (b) *"The security instrument or assignment thereof
vesting the secured creditor with title to the security
instrument shall be filed prior to the time of sale in the office
of the clerk of the superior court of the county in which the
real property is located."*  as said letter does not indicate  who
the secured creditor is; nor does identify the secured creditor
who has title to the security instrument but instead recites that
the assignment is "to be recorded" in the Office of the Clerk
of Muscogee County, Georgia.

113.   As such, Defendant BAC is without standing and is legally
precluded from foreclosing on and selling the Property.

114.   In an attempt to cure the deficiencies noted supra, Defendants
McCalla Raymer, Prommis Solutions and MERS have caused a
purported assignment (Exhibit "C") from MERS to BAC to be
recorded upon the Public Records of Muscogee County on

April 14, 2010.

115. On or about May 3, 2010, Plaintiff Jenkins filed suit in the Superior Court of Muscogee County which was styled SU-10-CV-1731.

## CLASS ACTION ALLEGATIONS

116. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all Georgia real property owners who are members of the following two subclasses:

(SUBCLASS 1: FORECLOSED BORROWER SUBCLASS)

117. Individuals whose real property was foreclosed upon, under the Power of Sale, by Defendants and Does 1-100 that did not have actual, valid, legal and non-fictitious written assignment of the mortgage, granting a secured creditor the standing to foreclose as statutorily required by O.C.G.A. §44-14-162 *et seq.*.

(SUBCLASS 2: BORROWERS FACING FORECLOSE SUBCLASS)

Individuals whose real property is being foreclosed upon, under the Power of Sale, by Defendants and Does 1-100 that do not

have actual, valid, legal and non-fictitious  written assignment of the mortgage, granting a secured creditor the standing to foreclose as statutorily required by O.C.G.A.  §44-14-162 *et seq.*.

118.   Excluded from the class are Defendants, their subsidiaries, successors and assigns, officers, directors and employees.

119.   Plaintiffs believe that there are thousands of members of the class although, at present, their identities are unknown.

120.   The losses suffered by members of the class are such that prosecution of individual actions is impractical or economically unfeasible.

121.   Prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to individual class members, which would establish incompatible standards of conduct for the Defendants, making concentration of the litigation concerning this matter in this Court desirable.

122.   There are questions of law and fact that are common to the members of the both classes, which questions predominate any questions that affect only individual members of the class.

123. There are questions of law common to the members of the class relating to the existence of the acts of the Defendants alleged herein, the wrongful nature thereof, and the type of damage suffered, to wit:

(a) Whether Defendants in collusion with MERS and Prommis Solutions have engaged in a conspiracy to defraud homeowners by conducting illegal foreclosures, taking advantage of the lack of judicial oversight in the current non-judicial foreclosure system in Georgia;

(b) Whether the Defendants have filed fraudulent documents within the Superior Courts of Georgia relating to transfers of mortgages, notes, assignments, and any other documents related to Real Property.

(c) Whether Defendants, their officers and agents have caused to be filed, fraudulent documents to disguise the real party in interest with respect to foreclosure proceedings and to further destroy the current system of deed recordation and constructive notice in the State of Georgia by using MERS to avoid properly filing assignments to deeds for the sole purpose of evading county clerk fees.

(d) Whether demands for payment send by Defendant firms/lenders to homeowners were falsified and included inflated fees that were not reflective of actual and necessary fees incurred by the servicer.

(e) Whether Defendant lenders failed to properly disclose the role of MERS and how its role as "nominee" affected the rights of the homeowners prior to their executing the Security Deed and Waiver of Borrower's rights.

(f) Whether Defendant MERS has acted outside the scope of its authorized capacity as nominee.

(g) Whether Defendant and/or Does 1-100 acted without authority pursuant to a Power of Sale during the foreclosure process.

(h) Whether Plaintiffs and the putative class they seek to represent are entitled to declaratory judgment, injunctive relief or damages.

(i) For Subclass 1 (Foreclosed Borrowers); whether the foreclosure sales conducted are void or voidable,

(j) For Subclass 2 (Borrowers facing foreclosure) whether pending foreclosure sales may be conducted.

124. Plaintiff's claims are typical of the claims of class members. Plaintiffs will adequately and fairly protect the class' interests. The interests of the Plaintiff coincide with that of the class and the interests of the Plaintiff are not antagonistic to interests of other members of the class.

125. A class action is superior to other available methods for the fair and efficient adjudications of this controversy.

126. If individual members of the class were to bring separate lawsuits, it would create a risk of inconsistent judgments and/or verdicts, unclear public policy regarding the accountability and wrong doing of Defendants, contradictory standards regarding what is acceptable, legal and proper behavior by Defendants.

127. In the absence of the class action device, Plaintiffs and members of the putative class they seek to represent would be left without a remedy for the wrongful acts alleged, and the Defendants would be unjustly enriched.

128. The class concerned in the foregoing complaint is definable. Prosecution as a class eliminates repetitious litigation, prevents multiple law suits being filed that involve the same parties and

questions of law and/or fact, provides relief for members with both large and small claims and allows for a judicial efficiency.

129. The only individual questions concern the identification of members of the Plaintiff class. Identification can be made by a review of records in possession of the Defendants and/or public records.

130. Mailed notice can be provided to Plaintiff class by various means of communications, as identified in the public records, the records of the Defendants and/or other sources. Publication notice can be provided to supplement mailed notice.

131. Plaintiff claims are typical of the claims of the Plaintiff class members. All are based on the same legal and remedial theories.

132. Plaintiffs will fairly and adequately protest the interest of all Plaintiff class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein. They are similarly situated with and have suffered similar injuries as the members of the class they seek to represent.

133. Plaintiffs have retained a team of attorneys experienced in handling defenses to foreclosures, as well as complex litigation

and/or class action suits involving unfair business practices and consumer law.  Neither the Named Plaintiffs nor their counsel have any interest that might cause them to not vigorously pursue this action.

134.   No unusual difficulties are likely to be encountered in the management of this action as a class action.

## FIRST CAUSE OF ACTION

## WRONGFUL FORECLOSURE

135.   The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

136.   Defendants conducted foreclosures as part of a fraudulent business scheme whereby various employees of Promiss, who were non-official witnesses acting under the guise of notary publics robo-signed attestation clauses prior to the date on which the notary public obtained a lawful commission and authorization to act as a notary public under the laws of the state of Georgia.

137.   The Assignments created by Prommis are, for the most part, uniform and include verbiage that specifically states: ***"IN WITNESS WHEREOF, the Assignor has hereunto set its hand***

*and seal this (date inserted).  Signed, sealed and delivered in the presence of :"*

138.   Under Georgia law, a notary public is commissioned for a term of 4 years, O.C.G.A. §45-17-5. Notary commissions are granted by the County Clerk of Court in either the county where the prospective notary resides or conducts, substantially, their business.  The beginning date of any notary commission is easily calculable. Anyone capable of basic math can determine the approximate beginning date of a Notary's commission by simply subtracting 4 years from the date of expiration recited on each document notarized.

139.   A security deed vests legal title to the property in the grantee, who may foreclose on the security interest. *Tomkus v. Parker*, 224 S.E.2d 353, 369 (Ga. Ct. App. 1978).  A "power of sale" in a security deed grants the original grantee the power to sell the property at a foreclosure sale as attorney-in-fact for the debtor to satisfy the debtor's delinquency.  An assignee of the original grantee of a security deed may exercise the power of sale contained in such security deed. O.C.G.A. § 23-2-114; *Allen v. Wade,* 203 Ga. 753, 755, 48 S.E.2d 538 (1948); *Williams v.*

*Joel,* 89 Ga. App. 329, 79 S.E.2d 401 (1953).  An assignee of a security deed, however, cannot exercise the power of sale and foreclose upon the security until there has been an actual assignment complying with Georgia law. *In re Cummings,* 173 B.R. 959, 962 (N.D. Ga. 1994).

140.  Georgia law requires that "All transfers of deeds to secure debt shall be in writing; shall be signed by the grantor or, if the deed has been previously transferred, by the last transferee; and shall be witnessed as required for deeds." O.C.G.A. § 44-14-64.  A deed must be attested in the manner prescribed by law for mortgages. O.C.G.A. § 44-14-61.  Recorded mortgages for real property must be attested or acknowledged ***by an official witness*** and at least one additional witness. O.C.G.A. § 44-14-33.  Pursuant to section 44-2-15 of the Georgia code, the official witness may be a notary public. O.C.G.A. § 44-2-15.  The validity of an assignment of a security deed is governed by the laws applicable to the recording of mortgages, O.C.G.A. § 44-14-33.

141.  Under Georgia law, "the registry of a deed not attested, proved, or acknowledged according to law, is not constructive notice to a

bona fide purchaser." *Hopkins v. Va. Highlands & Assoc., LP*, 541 S.E.2d 386, 390 (Ga. Ct. App. 2000) (quoting *Connif v. Hunnicutt*, 157 Ga. 823, 836, 122 S.E. 694 (Ga. 1924)).  As between the parties to the instrument, however, the deed is valid and binding absent a showing of fraud. *Duncan v. Ball*  172 Ga .App. 750, 752, 324 S.E.2d 477, 480 (Ga. Ct. App. 1984).  In *Leeds Bldg. Products, Inc. v. Sears Mtg. Corp*, the Georgia Supreme Court held that a deed that facially complies with statutory requirements provides constructive notice, but reaffirmed the general rule that a patently defective deed—a deed with a facial defect—does not constitute constructive notice to subsequent purchasers.  267 Ga. 300, 301-02, 477 S.E.2d 565 (Ga. 1996); *see also In re Yearwood*, 318 B.R. 227, 229 (Bankr.M.D.Ga.2004) (holding that where there is a patent defect in the security deed, there is no constructive notice like that of a latent defect); *In re Blackmon*, 283 B.R. 910, 912 (Bankr.E.D.Tenn.2002) (interpreting Georgia law to mean that a recorded instrument that is facially invalid does not constitute constructive notice to subsequent purchasers).

142.   A patent defect is a defect that "is obvious and easily detectable," such as the absence of an unofficial witness's signature on the face of the instrument. *In re Codrington*, 430 B.R. 287, 292 (N.D. Ga. 2009).

143.   By way of example, in *In re Yearwood*, the debtor executed a security deed to her residence in favor of the defendant. 318 B.R. 227, 228 (N.D. Ga. 2004). The security deed was notarized by an official witness, but did not bear the signature of an unofficial witness. *Id.* The court found that the Chapter 7 Trustee could avoid the defendant's interest in the property because the lack of unofficial witness's signature was a patent defect in the security deed, and thus there was no constructive notice to third parties of its invalidity.

144.   In another case, the Supreme Court of Georgia found that where a warranty deed showed on its face that it was for consideration in excess of $100 but that no transfer tax had been paid to entitle the deed to be recorded, the deed had a patent defect, was not entitled to be recorded, and could not serve as constructive notice to a subsequent purchaser. *Higdon v. Gates*, 231 S.E.2d 345, 346-47 (Ga. 1976). Finding that patent defect did not

afford constructive notice, the court affirmed the cancellation of the deed as a cloud upon the superior title of a subsequent purchaser. *Id.*

145.  The assignment of the security deed must comply with the attestation requirements of deeds, O.C.G.A. 44-14-61, and thus the signature of an *official witness* was required to create a valid assignment of the security interest. O.C.G.A. § 44-14-33. Just as a deed missing the signature of an unofficial witness is patently defective, an assignment missing the signature of an *official witness* is likewise patently defective.

146.  A foreclosure of the security in the absence of a valid assignment is null and void. *In re Cummings,* 173 B.R. 959, 962 (N.D. Ga. 1994). By way of example, in *Cummings,* the foreclosing creditor claimed that it was entitled to foreclose on the property because it had acquired a security interest prior to the foreclosure sale by assignment from the original grantee of the security deed. *In re Cummings,* 173 B.R. 959, 962 (N.D. Ga. 1994). There were two documents at issue in that case. The first document was a hand-written assignment, which stated that the original grantee "agrees to assign its interest" in the subject

property to the foreclosing creditor, but did not contain language of conveyance. The evidence before the court demonstrated that the assignment was not executed with the same formalities as the original deed containing the power of sale. *Id.* In addition, a second document entitled "Transfer and Assignment" from the original grantee to the foreclosing party was executed by the appropriate officers of the parties to the assignment with the same formalities of as the security deed, but the parties failed to proffer evidence concerning when the documents were executed and delivered with respect to the foreclosure date. *Id.* In the absence of evidence of execution and delivery, the court concluded that note and the security deed not actually assigned to the foreclosing party before the date of the foreclosure sale. *Id.* at 963. Since there was no proof of a valid assignment of the note and security deed, the foreclosure of the property was declared null and void. *Id.*

147.   The purported assignments do not comply with section 44-5-64 because the assignment of the security deed did not satisfy the attestation formalities prescribed by section 44-5-33, the purported assignment is not a valid assignment under Georgia

law.   Thus, any foreclosure of the security interest covered by the assignment is null and void.

148.   Although Georgia recognizes the doctrine of *de facto* notary public in cases in which a deed or other instrument is notarized by a notary public whose commission has expired at the time of execution and attestation. *See Thomas v. Gastroenterology Assocs. of* , 280 Ga. 698, 700, 632 S.E.2d 118, 120 (citing *Smith & Bondurant v. Meador*, 74 Ga. 416 (1885)).  In *Smith & Bondurant*, the court explained that a notary public who attests the execution of a document after his commission has expired shall be recognized by the court a notary public *de facto*.   74 Ga. at 418-19.  This doctrine exists as a matter of public policy: "where the public servant is acting in the place apparently all right, and the applicant to him in good faith has a deed witnessed or an oath administered, that it is better for society that the act de facto stand than that . . . the title to property be all wrecked, because parties did not know that the term of office of the public official expired the day before." *Id.*

149.   Notaries with expired commissions have already proven their qualifications to the clerk before obtaining their commissions,

and the clerk has been given the opportunity to deny or grant the commission. Additionally, the notary has maintained the position of an official for four years prior to execution. Here, the clerk has not yet confirmed approval of the individual's qualification to hold the office of notary public. Application of the de facto notary exception would grant official status to an individual who has yet to prove qualification for office, which is quite distinguishable from cases where the individual has already been authorized by the state to fulfill official duties. Because there are no cases in Georgia applying the *de facto* notary doctrine to cases in which the alleged notary has yet to obtain a commission at the time of signing, the public policy underlying the doctrine does not support a similar finding in the absence of a previously granted commission.

150. These false attestations by civilians acting under the guise of notary publics causes a patent defect in the required attestation of assignments and other deeds as more particularly described supra.

151. Upon the face of the document, the Defendant whose notary seal was stamped on the document in question on the day of

execution was not lawfully commissioned to act as a notary public or as an official witness on the date the documents were illegally and fraudulently executed.

152.   Signatures of official witnesses are required to create valid assignments of security interests (O.C.G.A. § 44-14-33) and therefore the alleged assignments, each and every one, are invalid.  Assignments of security deeds must comply with O.C.G.A. § 44-14-61.

153.   Any foreclosure of the security in the absence of a valid assignment is null and void *ab initio. In re Cummings,* 173 B.R. 959, 962 (N.D. Ga. 1994).  Any foreclosure conducted using fraudulently signed and attested documents, which the Defendants knew or should have known to be fraudulently executed, including deeds, transfers, assignments or any other document, that are missing the signature of an unofficial witness and deeds missing the signature of an *official witness (emphasis added)* are defective.  Therefore, any wrongful foreclosures are void under O.C.G.A. § 23-2-114.

154.   The Defendants' fraudulent assignments creates both patently and latently defective deeds, which slanders the title of any

property foreclosed upon that relied upon an assignment with the fraudulent attestation causing plaintiffs damages.

## SECOND CAUSE OF ACTION

## WIRE FRAUD

155.  The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

156.  Defendants used wire communications, including but not limited to facsimile's, emails and the internet to accomplish their scheme to defraud the public, the Courts and the non-judicial foreclosure system in Georgia by causing to be sent, filed, and recorded mortgage documents which they knew or should have known to be fraudulent in violation of 18 U.S.C. § 1343. .Because of said actions of Defendants  Plaintiffs are entitled to damages.

## THIRD CAUSE OF ACTION

## RESPA VIOLATION

157.  The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

158.  Defendants did not properly notified borrowers of transfers of servicing rights as required by 12 U.S.C. § 2605. With the

exception of MERS, Defendant who are bankers, servicers and law firms are debt collectors as contemplated by the meaning of FDCPA 15 U.S.C. §1692K *et seq..*

159. Defendants willfully, wantonly and knowingly filed false and fraudulent documents with county clerks and courts in a deliberate attempt to defraud the Plaintiffs into believing that a legal collection of debt was attempted when the Defendants knew, or should have known, that they had no legal standing to collect a debt from Plaintiffs and that the documents used to effect such transfers were fraudulently executed and attested in violation of state and federal laws.  Plaintiff demands damages pursuant to 12 U.S.C. §2605(f) and FDCPA 15 U.S.C. §1692K *et seq..*

## FOURTH CAUSE OF ACTION

## Violation of the Fair Debt Collection Practices Act ("FDCPA")

160. The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

161. Defendants improperly misrepresented themselves to Plaintiffs to be the party in interest with legal authority to collect on debts secured by a deed when in fact they are not authorized to collect

debts on behalf of the true party in interest in violation of 15

U.S.C. § 1692 *et seq.*. Because of said actions of Defendants ,

Plaintiffs are entitled to damages.

## FIFTH CAUSE OF ACTION

## CIVIL CONSPRIACY AND FRAUD (MERSCORP and MERS, Inc.)

162.  The contents of the paragraphs set forth above are incorporated

here as if fully set forth herein.

163.  Defendant MERS and its parent company, MERSCORP at the

direction of the "founding shareholders" which include Bank of

America, Wells Fargo, Fannie Mae, Freddie Mac, and other

parties, which may include Defendant Does 1-100 colluded to

create a fictitious corporation, designed and designated a

"bankruptcy remote" vehicle, acting at all times as a strawman,

and designed specifically to avoid paying county clerk filing

fees which are routinely required when recording any type of

transfers of security deeds.

164.  In 1996, mortgage lenders created Mortgage Electronic

Registration Systems, Inc ("MERS") in order to internally track

secondary market sales of promissory notes and home loan

servicing rights by and between its members.  Mortgage

Electronic Recording Systems, Inc. subsequently changed its name to MERSCORP and used the name Mortgage Electronic Recording Systems, Inc. for their bankruptcy remote subsidiary, MERSCORP, Inc. is the parent company of Mortgage Electronic Recording Systems, Inc., commonly known as "MERS".

165.   When a mortgage is registered under the MERS system, MERS holds bare legal title acting "solely as nominee" for their members, which may be banks, mortgage lenders, title companies, or even Government Sponsored Entities.

166.   MERS maintains an electronic registry that purports to track the various sales and assignments of notes when they are sold from the original lenders to third parties.

167.   MERS' theory is that as long as the subsequent sale of the servicing rights or the promissory note is sold to another "insider" member, MERS can remain the "nominee" for security deeds and the "beneficiary" for deeds of trust on behalf of the new owner.

168.   To the courts, county clerks and general public, it appears as if one person continues to hold the deed and thus no recordation fees are incurred by MERS members even though the sale of

promissory notes and servicing rights occur multiple times within a single mortgage transaction over the life of the loan.

169. The role of MERS is not properly disclosed to borrowers in their loan documents. MERS provides that it is a "nominee", but the term "nominee" is never defined in the security deed and no disclosures regarding MERS role in the transaction were provided to homeowners prior to executing the security deed.

170. Homeowners were and are **never informed** prior to arrival at the closing that MERS is a party to the transaction.

171. Upon arrival at the closing, homeowners are given an untenable "take it or leave it" choice in regards to MERS. They may **ONLY** accept giving legal title to MERS if they wish to close the transaction for a home for themselves and their families.

172. MERS lacks the capacity to act as a Trust or Corporate Fiduciary in the State of Georgia, thereby rendering void the security deeds of the Plaintiff and putative plaintiff class that named MERS, acting solely as "nominee" for the Lender and the Lender's successors and assigns.

173. The term "nominee" is not defined in the security deed.

174. Georgia law does not recognize the term "nominee" in a real estate transaction wherein the grantee holds legal title for the benefit of another.

175. Black's Law Dictionary defines "nominee" as "[a] person designated to act in place of another, usually in a very limited way" and as "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others."Black's Law Dictionary 1076 (8111 ed. 2004).

176. A "beneficiary" is defined as "one designated to benefit from an appointment, disposition, or assignment or to receive something as a result of a legal arrangement or instrument." Black's Law Dictionary 165 (8111 ed. 2004).

177. According to MERS own admission in a Nebraska Court:

*"[MERS] does not acquire mortgage loans and is therefore not a mortgage banker under §45-702(6) because it only holds legal title to members' mortgages in a nominee capacity and is contractually prohibited from exercising any rights with respect to the mortgages without the authorization of the members. Further, MERS argues that it does not own the promissory notes secured by the mortgages and has no right to*

*payments made on the notes.  MERS explains that it merely "immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur".* (See Mortgage Elec. Reg. Sys., Inc. v. Nebraska Department of Banking, 270 Neb. 529, 704 N.W. 2d 74 (2005) (brief for MERS). The Nebraska court found that MERS was not a mortgage banker and held that MERS is a legal title holder in nominee capacity that permits lenders to sell and assign their interests in notes and servicing rights to third party investors without recording each transaction.

178.   Payment of county clerk fees are deliberately avoided for each MERS transaction, which as a consequence, destroys the traditional notice given through recordation to third parties and destroying any chain of title relating to such transaction, except as such transfers or assignments are saved and held in the MERS electronic database and therefore available ONLY to "insider" members but not to the Courts or the general public.  In exchange for its services, MERS is paid through membership fees charged to its members

179. The creation of MERS had the foreseeable effect of avoiding transfer fees associated with the traditional recording of assignments and transfers in the county clerk's deed books and evading disclosure of the time, nature and circumstances of assignments and transfers as well as the identity of the true owner of the mortgage and promissory note.

180. Any notice of foreclosure given by a MERS' attorney was improper and does not qualify as "notice" under the meaning of O.C.G.A. §44-14-162.2.  Under that code section, notice of initiation of foreclosure proceedings must be given by the secured creditor at least 30 days before the foreclosure sale date. In violation of O.C.G.A. §44-14-162.2, MERS knowingly sent false and fraudulent information with the intent to defraud and mislead the Plaintiff into thinking that a lawful foreclosure was being initiated against them by the party with legal authority to foreclose when in fact MERS and other culpable defendants did comply with the pre-requisites of O.C.G.A. §44-14-162 *et seq* MERS is not a secured creditor and cannot send the notice required under O.C.G.A. §44-14-162. *et seq*

181.   By its own admission, MERS is not a secured creditor because it does not hold the security for the subject real properties and it **never** has any beneficial interest in the debt instrument. Therefore, MERS has never been entitled to collect any debt from Plaintiffs, enforce collection of any debt against Plaintiffs or initiate foreclosure proceedings against Plaintiffs because MERS never had legal standing to do same.  MERS is not a secured creditor under Georgia law because it is barred from acting in a fiduciary capacity with respect to the note.

182.   Any deeds that were prepared, filed and/or recorded in violation of the notice requirements of O.C.G.A. §44-14-162 *et seq* should be rendered void in order to restore title to the owner who held title at the time of the wrongful foreclosure.

183.   Defendant MERSCORP and its shareholders, Bank of America, and Wells Fargo among them, (Exhibit "F") has at all times relevant been in direct control of Defendants MERS who operates, controls, owns and manage the operations and business activities of Defendant MERS.

184.   MERSCORP and its shareholders deliberately created MERS, a "bankruptcy remote" company, to act as a strawman, and

present itself as a "nominee" for purposes of assignments and transfers of servicing rights.

185.  MERSCORP and its founding members have used MERS, Inc. as the instrumentality through which they (1) avoid paying court and county clerk recordation fees for assignments and transfers (2) conduct fraudulent transfers and assignments, (3) outsource foreclosure paperwork to foreclosure mill law firm who they knew or should have known were unlawfully robo-signing mortgage assignments and conveyances for use in conducting wrongful foreclosures.

186.  Defendants MERSCORP and its member shareholders created MERS, Inc. to promote injustice, protect fraud and defeat the purpose of law, to provide a uniform system of recordation of assignments and transfers which would serve as proper constructive notice to all third parties and bona-fide purchasers.

187.  For these reasons, the corporate veil of MERS, Inc. and MERSCORP should be pierced, and these Defendants should be disgorged of any profits and interests earned as a result of its tortuous and illegal conduct.

188. Its members, officers and directors should be held personally liable for any and all fraud occurring through the acts of MERS, Inc. and MERSCORP.[2]

189. Defendant MERS, as nominee and/or assignee, was <u>not</u> the secured creditor of the Plaintiff's security interest because the improperly attested assignment conveyed no legal interest in the subject property.  Even if the assignee became the holder in due course of the note, in the absence of a security interest in the property, the assignee does not become the "secured" creditor, and any notice received by the residential debtor from the alleged assignee is insufficient to comply with the strict notice requirements of section 44-14-162.1.

190. Where a creditor does not comply with the statutory duty to exercise fairly the power of sale in a deed to secure debt, the debtor may pursue a cause of action for wrongful foreclosure under O.C.G.A. § 23-2-114.  *DeGloyer v. Green Tree Servicing, LLC*, 662 S.E.2d 141 (Ga. Ct. App. 2008).

_____

[2] *Boafo v. Hospital Corp. of America*, 338 S.E.2d 477 (Ga. Ct. App. 1985), *Humana, Inc. v. Kissun*, 471 S.E.2d 514 (Ga. Ct. App. 1996).

191.   Additionally, section 44-14-162 of the Georgia code requires that notice of the intention to exercise the power of sale in a security deed of residential property be given the debtor by the *secured creditor* no later than thirty (30) days before the date of the proposed foreclosure sale.   O.C.G.A. § 44-14-162 *et seq.*

192.   The notice requirement, being in derogation of the common law, is strictly construed.   *See Breitzman v. Heritage Bank,* 180 Ga. App. 171, 348 S.E.2d 713 (1986).

**193.**   Georgia statutes require notice by the "secured creditor" to the "debtor."  Foreclosures conducted by Defendants pursuant to illegal assignments are wrongful foreclosures, are tortuous conduct and Plaintiffs are entitled to recover damages for same.[3]

## SIXTH CAUSE OF ACTION

## ILLEGAL FEE SPLITTING AND UNAUTHORIZED

## PRACTICE OF LAW

194.   The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

---

[3] *See Roylston v. Bank of America, N.A.,* 290 Ga. App. 556, 660 S.E.2d 412, Ga. App. (2008). Where a grantee creditor does not comply with the statutory duty to exercise fairly the power of sale in a deed to secure debt, OCGA § 23-2-114, the debtor may either seek to set aside the foreclosure or sue for damages for the tort of wrongful foreclosure. *Calhoun First Nat. Bank v. Dickens,* 264 Ga. 285, 286, 443 S.E.2d 837, 838 (Ga. 1994) (citing *Clark v. West,* 196 Ga. App. 456, 457, 395 S.E.2d 884 (1990); *Curl v. First Federal,* 243 Ga. 842, 843, 257 S.E.2d 264 (1979)).

195. The categorization of the fees as "administrative" or something other than illegal fee splitting was a direct attempt to conceal the nature of the arrangement by and between Defendants.

196. These fees are eventually charged back to the class members because they are added into default statements and usually included in the foreclosure notices sent to Plaintiffs referencing the "default" amount.

197. Defendants have knowingly engaged in illegal fee splitting to the sole financial profit and benefit of Defendants.

198. Prommis Solutions Holdings currently has **TWENTY YEAR** (20) contracts to perform services, called "networking agreements" or similar, with 4 separate Law firms who specialize in default "resolution", specifically, McCalla Raymer LLC, Johnson & Freedman LLC, Morris Hardwick Schneider, and Pite Duncan LP.

199. In furtherance of their scheme to conceal their fraudulent and unethical conduct, Defendants Prommis Solutions, Inc. and Defendants MERS, MERSCORP and Great Hills have executed confidentiality agreements with the intention of never disclosing the true nature and terms of their illegal, fee-splitting agreements

therefore depriving the mortgagors and other interested parties of the true nature of their business relationship and financial arrangement to receive payment for services rendered, whether those services were in fact rendered or not.

200. Some of the fees that are charged to the class members are never actually earned by the Defendants.  For example, in Plaintiff Jenkins, the notice of default sent by Defendant McCalla Raymer includes fees for administration and foreclosure, which may or may not have been actually incurred by the Defendants.

201. While the above-named Defendants may argue that disclosure of business relationships, terms or financial arrangements may disclose the trade secrets of competitors, the true purpose of the confidentiality and/or non-disclosure agreements is to protect a common scheme of fraud, protect cash flow, engage in a conspiracy to conceal the unethical conduct and agreements of Defendant attorneys and their non-attorney co-conspirators and to prevent full disclosure of the role of the Defendants and their respective financial interests in and roles in the foreclosure process.

202.   Defendant Prommis Solutions, Inc. is not a law firm and is therefore a non-attorney.  Non-attorneys in the State of Georgia are barred and prohibited from splitting fees with attorneys.

203.   Defendant Prommis Solutions, Inc. and Defendants McCalla Raymer have continuously engaged in a common course or scheme of illegal fee splitting, which fees are then billed back to the class members in the form of "fees" for foreclosures, administration, etc.

204.   The cumulative effect of Defendants illegal and tortuous conduct is to perpetuate a continuing fraud on the public, Courts and mortgagors in default in a collective effort to knowingly conduct wrongful foreclosures.

205.   Defendants have generated billions of dollars in fees, gained money from governmental entities who have insured the defaulted loans and generated substantial profits from their wrongful foreclosure scheme. Plaintiffs have suffered harm and damages from Defendants schemes and unlawful practices.

## SEVENTH CAUSE OF ACTION

## (Great Hill Partners, Inc. and Prommis Solutions, Inc.)

206.   The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

207.   The history and founding of Prommis Solutions, Inc. is summarized on the Great Hills Partners, Inc. website under the subsection titled "case studies" as follows:  "In 2005, GHP was looking for a way to invest in the expected downturn in residential housing when Chairman and former CEO Dan Phelan was contacted. Phelan, a lawyer by training, had built a large processing business providing foreclosure and bankruptcy technology for the residential real estate market. Interestingly, the operations were co-mingled inside a working law firm. In order to provide founder liquidity and prepare for a national business expansion, Phelan interviewed several private equity firms to lead a transaction. GHP worked with Phelan to create a stand-alone commercial enterprise in a novel "spinout" from the law firm. Importantly, GHP was able to introduce a CFO and CIO from a prior successful portfolio investment to work with Phelan on the project. In 2006, with debt financing from GHP relationship lenders and our equity sponsorship, Prommis Solutions, Inc. was founded."  (Exhibit "G")

208.  Great Hills Partners, Inc. funded Prommis Solutions, Inc. on February 24, 2006.

209.  Defendant Great Hill Partners, Inc., the majority owner of Prommis Solutions Holding, parent company of Prommis Solutions, Inc. caused and directed Prommis Solutions, Inc. to engage, collude and conspire with law firms to promote and protect fraud by executing non-disclosure, non-confidentiality, networking and other agreements to further their unethical practice of illegal fee splitting to the detriment of Class members.

210.  Defendants Prommis Solutions, Inc., Prommis Solutions Holding and Great Hill Partners, Inc. knowingly and intentionally outsourced foreclosure services to law firm "foreclosure mills" and engaged in a common course of illegal business conduct, that is, robo-signing, for the purpose of fraudulently conveying, recording and attesting falsified mortgage documents, including but not limited to assignments and transfers of servicing rights, in a common and concerted effort to defraud mortgagors, courts, county clerks, bona-fide purchasers and other third parties not named herein.

211.  Non-lawyer Defendants engaged in fee-splitting had direct control and management of attorney activities through networking or other similar agreements and therefore engaged in the unauthorized practice of law.

212.  Non-lawyers Defendants prepared and continue to prepare documents for filing by attorneys, and directly managed the activity and voluminous robo-signed documents conveyed, executed and recorded pursuant to a networking or similar agreement.

213.  The Defendants unethical conduct perpetuated a scheme of concealing illegal fee splitting, charged mortgagors fees beyond and above those which were actually incurred or agreed upon, concealed the nature of agreements concerning fee earning and fee-splitting and provided a "volume" of cases to foreclosure mill law firms for the purpose of continuing this unethical, tortuous, illegal and wrongful course of conduct.

214.  Defendants Great Hill Partners, Inc., Prommis Solutions Holding and Prommis Solutions, Inc., promoted injustice, protected fraud and defeated the purpose of law and intentionally entered into agreements for the purpose of

concealing the nature of their illegal fee-splitting relationships with law firms to interested parties.

215.   The corporate veil of Great Hill Partners, Inc., Prommis Solutions Holding and Prommis Solutions, Inc. should be pierced.  These Defendants should be disgorged of any profits and interests earned as a result of tortuous and illegal conduct. Its members, officers and directors should be held personally liable for any and all fraudulent acts committed in furtherance of this common course of business conduct. [4]

## EIGHTH CAUSE OF ACTION

## RICO VIOLATIONS

Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1962)

216.   The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

**217.**   Plaintiffs and all members of the class are considered persons within the meaning of 18 U.S.C. §1961(3) and 1964.

---

[4] *Boafo v. Hospital Corp. of America,* 338 S.E.2d 477 (Ga. Ct. App. 1985), *Humana, Inc. v. Kissun,* 471 S.E.2d 514 (Ga. Ct. App. 1996).

Defendants are also considered persons within the meaning of 18 U.S.C. §1961(3).

218.   Defendants followed the directions of Defendants Bank of America and Wells Fargo in their capacity as shareholders of MERS and "clients" of Prommis and McCalla Raymer when they filed illegal and fraudulent foreclosures and caused to be prepared and filed other false documents with Courts of this state knowingly and with the intent defraud the Courts, delinquent homeowners and the general public for their own sole benefit and without standing.

219.   Collectively, defendants are an "enterprise" under the meaning of 18 U.S.C. §1961(4) because they have been and are presently engaging in foreign and interstate commerce and their activities directly affect foreign or interstate commerce.  In an attempt to defraud literally thousands of homeowners, Defendants continued a long-term course of conduct be perpetuating fraud and deceit against Plaintiffs during the class period.

220.   As part of their interstate commerce scheme, Defendant, acting directly or indirectly through directors, officers and employees caused fraudulent wire transfers and obtained a monetary profits

from the fraudulent and illegal foreclosures in violation of 18

U.S.C. §§1341 and 1343, and 15 U.S.C. §§45 and 52.

**221.** Defendants gained a monetary benefit from their fraudulent

conduct, and profits made from racketeering activities was used

to continue a scheme to further defraud Plaintiffs and violate

RICO laws.

222. Plaintiffs suffered actual, real damages when Defendants

knowingly misrepresented to Plaintiffs that they parties to a

lawful foreclosure process when in fact the documents presented

by Defendants to Plaintiffs were executed unlawfully as part of a

foreclosure mill "assembly line" process which operated to

produce income for the Defendants to use in further perpetuation

of their fraudulent schemes and provided income for the

Defendants to continue their racketeering activities.

223. Documents prepared with the intent to defraud Plaintiffs were

produced by Defendants who knowingly engaged in fraudulent

conduct, which conduct can be considered predicate acts of

racketeering activity under the meaning of 18 U.S.C. §1961(1)

since a common pattern of fraud occurred during the Class

period.  The fraudulent activity is likely to continue and is

therefore capable of indefinite repetition.

224.   Because of the broad scope of damages caused by Defendants, a

specific, monetary amount is undetermined at this time.

Racketeer Influenced and Corrupt Organizations Act18 U.S.C. §1962(c) –

225.   The contents of the paragraphs set forth above are incorporated

here as if fully set forth herein.

226.   The Defendants are collectively engaged in an enterprise whose

course of conduct and activities affect interstate and foreign

commerce within the meaning of 18 U.S.C. §§ 1961(4) and

1962.  The enterprise created by the defendants maintains an

existence separate from the allegations of racketeering activity.

227.   Defendants knowingly and in consensus participated, directly

and indirectly, engaged in, managed and directed the affairs of

the enterprise by continuing a pattern of racketeering activity

over a span of years, including but not limited to knowingly

preparing fraudulent documents, sending facsimile transmissions

and wires to homeowners, filing false documents the County

Clerks and continuously misrepresenting the true party in

interest with the intent to further perpetuate the fraud and

racketeering activities which give rise to the allegations of violations of 18 U.S.C. §§1962(c) and 1343 (as §1343 relates to wire fraud/facsimile transmissions/emails, etc.).

228.   Any wire transmissions, including but not limited to facsimiles, emails and the like were send from Defendants in their respective states to the Plaintiff homeowners, who are all owners of real property located in Georgia.  As a direct and proximate result of Defendant's illegal behavior and racketeering activities, Plaintiffs suffered actual and real damages, including but not limited to the loss of the real property which they owned.

229.   Defendants should disgorge themselves from any and all profits and interest they have unlawfully obtained at the expense of members of the Class and a constructive trust should be created therefrom wherein the profits constitute the *corpus* of same.

## NINTH CAUSE OF ACTION

## DAMAGES

230.   The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

231.   Where a creditor does not comply with the statutory duty to exercise fairly the power of sale in a deed to secure debt, the

debtor may pursue a cause of action for wrongful foreclosure under O.C.G.A. § 23-2-114. *DeGloyer v. Green Tree Servicing, LLC*, 662 S.E.2d 141 (Ga. Ct. App. 2008).

232.   Where a foreclosing creditor fails to comply with the notice requirements of section 44-14-162.1, the residential debtor may pursue a claim for wrongful foreclosure. *Roylston v. Bank of America, N.A.*, 290 Ga. App. 556, 660 S.E.2d 412, Ga. App. 2008.

233.   The fact that the foreclosing party did not have a legal interest in the property and thus did not have a valid power to sell the property is a cognizable defense for a wrongful foreclosure claim. *Id.* "A claim for wrongful exercise of power of sale under 23-2-114 can arise when the creditor has no legal right to foreclose." *Id.* (reversing trial court ruling that creditor's lack of a legal interest in the foreclosed property barred a wrongful foreclosure claim); *see also Rapps v. PHH US Mtg. corp*, (allowing appellant to maintain wrongful foreclosure claim based on allegations that appellee altered deed so that it could foreclose on property that was never subject to the deed).

234.   Where a grantee creditor does not comply with the statutory duty to exercise fairly the power of sale in a deed to secure debt, OCGA § 23-2-114, the debtor may either seek to set aside the foreclosure **or** sue for damages for the tort of wrongful foreclosure. *Calhoun First Nat. Bank v. Dickens,* 264 Ga. 285, 286, 443 S.E.2d 837, 838 (Ga. 1994) (citing *Clark v. West,* 196 Ga. App. 456, 457, 395 S.E.2d 884 (1990); *Curl v. First Federal,* 243 Ga. 842, 843, 257 S.E.2d 264 (1979)).   If the debtor elects to set aside the foreclosure sale, the debtor cannot also recover damages for the value of the property; the debtor may seek both cancellation of the foreclosure sale and recovery of damages "not associated with the value of the property for other wrongful conduct by a mortgagor." *Calhoun,* 443 S.E.2d at 838; *Clark,* 395 S.E.2d at 885-86 (explaining that damages "for other breaches of duty and other losses" are allowed in action to cancel foreclosure sale).

235.   In a wrongful foreclosure action, the injured party may seek damages for mental anguish in addition to the cancellation of the foreclosure. *DeGolyer v. Green Tree Servicing, LLC,* 291 Ga. App. 444, 662 S.E.2d 141,147 9Ga. Ct. App. 2008).   "As a

general precept, damages for mental distress are not recoverable in the absence of physical injury where the claim is premised upon ordinary negligence.   However, when the claim is for intentional misconduct, damages for mental distress may be recovered without proof of physical injury." *Clark*, 196 Ga. App at 457-58; 395 S.E.2d at 886 (quoting *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 252 Ga. 149, 150, 311 S.E.2d 818 (Ga. 1984)).

236. An action for damages for emotional distress in a wrongful foreclosure action is treated as an action for intentional infliction of emotional distress, and the plaintiff has the burden to prove intentional conduct to cause harm.  *Mc Carter v. Banker Trust Co.,* 543 S.E.2d 755, 758 (Ga. Ct. App. 2000).

**237.**   Breach of the statutory duty upon mortgagee to exercise fairly and in good faith the power of sale in a deed to secure debt is a tort compensable at law, and entitles the debtor to punitive damages where appropriate. *Clark v. West*, 196 Ga. App. 456, 457, 395 S.E.2d 884, 886 (Ga. Ct. App. 1990); *see, e.g., Curl v. First Federal Savings & Loan Assn.*, 243 Ga. 842, 843-844(2), 257 S.E.2d 264 (1979) (affirming award of actual and punitive

damages in an action for wrongful foreclosure); *Decatur Investments Co. v. McWilliams,* 162 Ga. App. 181, 181, 290 S.E.2d 526, 527 (1982) (affirming award of punitive damages in a wrongful foreclosure action where debtor provided sufficient evidence of creditor's bad faith).

238.    Because an improperly attested deed does not provide constructive notice of the assignee's security interest, the bona fide purchaser has priority of title to the disputed property as against the assignee, and thus, the assignee's deed should be canceled as a cloud upon the superior title of the purchaser. *See Higdon v. Gates,* 238 Ga. 105, 231 S.E.2d 345 (Ga. 1976) (affirming trial court's cancellation of bank's security deed as a cloud upon title of subsequent purchaser where the deed was not properly attested because it showed on its face that the tax had not been paid to entitle it to be recorded).

239.    As a result of Defendant's illegal and tortuous conduct in conducting wrongful foreclosures, Plaintiffs request, actual,

compensatory, intentional infliction of emotional distress and punitive damages[5].

240. Plaintiffs further pray that Defendants be disgorged from any profits obtained as a direct or indirect result of their illegal, intentional and tortuous conduct and that a constructive trust be imposed thereon.

241. Plaintiffs request that all wrongful foreclosure sales are deemed void and set aside and that the court impose and issue restraining orders and/or protective orders against Defendants on behalf of all Plaintiffs who are currently victims of wrongful foreclosures.

242. Plaintiffs respectfully request that attorney fees be paid by Defendants in all appropriate stages of the proceedings, if any.

## COUNT TEN- PUNITIVE DAMAGES

243. The contents of the paragraphs set forth above are incorporated here as if fully set forth herein.

244. Defendants are banking institutions, mortgage servicers and licensed attorneys who are held to a high standard of honesty.

---

[5] *Clark v. West*, 196 Ga. App. 456, 457, 395 S.E.2d 884, 886 (Ga. Ct. App. 1990); *see, e.g., Curl v. First Federal Savings & Loan Assn.*, 243 Ga. 842, 843-844(2), 257 S.E.2d 264 (1979) (affirming award of actual and punitive damages in an action for wrongful foreclosure); *Decatur Investments Co. v. McWilliams*, 162 Ga. App. 181, 181, 290 S.E.2d 526, 527 (1982) (affirming award of punitive damages in a wrongful foreclosure action where debtor provided sufficient evidence of creditor's bad faith).

245.   Defendants' frauds and other misconduct upon the public and the judiciary for their financial benefit is reprehensible, outrageous and demands serious punitive damages to deter Defendants from further harming the public and deceiving the judiciary.

246.   Defendants' conduct described herein was done with conscious and intentional disregard  of Plaintiffs' and the Class members rights and with the intent to injure, vex and annoy and take Plaintiffs' and the Class without due process of law and the same constituted oppression, fraud or malice, entitling Plaintiffs and Members of the Class to an award of punitive damages in the amount appropriate to punish or set an example of Defendants and to deter them from such conduct.

## JURY DEMAND

247.   Plaintiff  demands a trial by Jury

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the relief herein sought as follows:

1. `That the Court determine that this action may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure;

2. That defendants , their subsidiaries, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf or in concert with them  be permanently  restrained and enjoined  from continuing the unlawful conduct herein alleged with respect to any real estate transactions;

3. That the aforesaid conduct of Defendants be adjudged and declared to have been in violation of the law and statutes of Georgia and other states and the laws of the United States , and that judgment be entered for Plaintiffs and the members of the class and against Defendants for the amount of damages determined to have been sustained by them or otherwise allowed by law, together with punitive damages to punish Defendants and deter them from future misconduct, multiple damages  where authorized by law and statute,  compensatory, restitution and all allowable damages be granted to Plaintiff and the class regarding all violations alleged herein ;

4.  That the aforesaid conduct of Defendants be adjudged and declared

to have been in violation of RICO, 18 U.S.C.§1961 et seq., and

that judgment be entered for Plaintiffs  and the members of the

class and against Defendants for threefold the amount of damages

sustained by Plaintiffs and the class together with the costs of this

action , including reasonable attorneys' fees;

5.  That reasonable attorney fees and costs of the suit be granted to

Plaintiff and the Class;

6.  That Punitive damages be granted to Plaintiff and the Class

7.  That compensatory damages, restitution and all allowable damages

be granted to Plaintiff and the Class regarding the RESPA, Fraud

and other violations alleged herein above;

8.  That Plaintiffs demand a trial by jury; and

9.  That Plaintiff and members of the class have such other and further

and/or different relief as the Court may deem just and proper.,

10. Any other further and different relief deemed proper by the court.


Respectfully submitted this 12th day of November, 2010.

Louise T. Hornsby
Attorney for Plaintiffs
Georgia Bar 367800
2016 Sandtown Rd. SW
Atlanta, Georgia 30311

(404) 752-5082
(404) 758-5337 fax

## CERTIFICATE OF COMPLIANCE

This is to certify that this document was prepared in Times Roman , 14 point font that complies with this Court's Rules.

Louise T. Hornsby, Esq.
Counsel for Plaintiffs
Georgia Bar No. 367800

2016 Sandtown Rd.SW
Atlanta, Georgia 30311
404-752-5082
404-785-5337 (fax)

EXHIBIT
"A"

2232796829

**BORROWER COPY**

*received 4/2/10*

LAW OFFICES
# MCCALLA RAYMER, LLC
1544 OLD ALABAMA ROAD
ROSWELL, GEORGIA 30076

TELEPHONE: (770) 643-2148
TELEFAX: (770) 643-4062
1-800-845-8633

March 26, 2010

Wendy Jenkins
7372 Cedar Creek Loop
Columbus, GA 31904

RE:    NOTICE OF FORECLOSURE SALE - Note and Security Deed - BAC Home Loans
Servicing, LP Fka Countrywide Home Loans Servicing LP
vs. Wendy Jenkins

|  |  |
|---|---|
| Servicing Lender's #: | 22594427 |
| Our File #: | 5796510-FT11 |
| Original Borrower: | Wendy Jenkins |
| Current Borrower: | Wendy Jenkins |
| Property: | 7372 Cedar Creek Loop |
|  | Columbus, Georgia 31904 |
|  | Muscogee County, Georgia |
| FHA Case #: | 1053859767703 |

Dear Borrower:

By letter dated March 4, 2010 (the "Initial Communication Letter") we notified you that the above-referenced loan had been referred to this law firm for handling.  That letter also advised you of certain rights (the "Borrowers Rights"- - which include your right to validate the debt) you could exercise within 30 days of your receipt of the Initial Communication Letter.  Nothing in this letter will prevent you from exercising the Borrower's Rights as explained in the Initial Communication Letter.

Please be advised that if you are not obligated on this loan, or if you have received a discharge in a bankruptcy case where your personal liability on this loan was extinguished, then any action we take would be limited to the foreclosure of the above referenced property.  If you are currently under bankruptcy protection, please fax your bankruptcy case information to us at (866) 812-4732.

The entire amount of the outstanding balance of principal and interest owed on the loan and any other authorized charges is now due and payable.  Additionally, the terms of your note call for the



**THIS IS AN ATTEMPT TO COLLECT A DEBT.   ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

BORROWER COPY

NOTICE OF SALE UNDER POWER

GEORGIA, MUSCOGEE COUNTY

**THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Under and by virtue of the Power of Sale contained in a Security Deed given by Wendy Jenkins to Mortgage Electronic Registration Systems, Inc., dated July 3, 2008, recorded in Deed Book 09426, Page 33, Muscogee County, Georgia Records, as last transferred to BAC Home Loans Servicing, LP Fka Countrywide Home Loans Servicing LP
by assignment to be recorded in the Office of the Clerk of Superior Court of Muscogee County, Georgia Records,conveying the after-described property to secure a Note in the original principal amount of TWO HUNDRED FORTY-FIVE THOUSAND EIGHT HUNDRED EIGHTY-THREE AND 0/100 DOLLARS ($245,883.00), with interest thereon as set forth therein, there will be sold at public outcry to the highest bidder for cash before the courthouse door of Muscogee County, Georgia within the legal hours of sale on the first Tuesday in May, 2010, the following described property:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

The debt secured by said Security Deed has been and is hereby declared due because of, among other possible events of default, failure to pay the indebtedness as and when due and in the manner provided in the Note and Security Deed. The debt remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, as provided in Security Deed and by law, including attorney's fees (notice of intent to collect attorney's fees having been given).

Said property will be sold subject to any outstanding ad valorem taxes (including taxes which are a lien, but not yet due and payable), any matters which might be disclosed by an accurate survey and inspection of the property, any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matters of record superior to the Security Deed first set out above.

The entity that has full authority to negotiate, amend, and modify all terms of the mortgage with the debtor is: Bank of America, 177 Countrywide Way, Mail Stop: CAO-911-01-05, Lancaster, CA 93536, (661) 951-5722. Please understand that the secured creditor is not *required* by law to negotiate, amend, or modify the terms of the mortgage instrument.

To the best knowledge and belief of the undersigned, the party in possession of the property is Wendy Jenkins or a tenant or tenants and said property is more commonly known as **7372 Cedar Creek Loop, Columbus, Georgia 31904.**

The sale will be conducted subject (1) to confirmation that the sale is not prohibited under the U.S. Bankruptcy Code and (2) to final confirmation and audit of the status of the loan with the holder of the security deed.

BAC Home Loans Servicing, LP Fka Countrywide Home Loans Servicing LP


as Attorney in Fact for

Wendy Jenkins

McCalla Raymer, LLC



**THIS IS AN ATTEMPT TO COLLECT A DEBT.   ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

1544 Old Alabama Road
Roswell, Georgia 30076
www.foreclosurehotline.net


MR/ske     5/4/10
Our file no. 5796510-FT11

**THIS IS AN ATTEMPT TO COLLECT A DEBT.   ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

EXHIBIT "A"

All that lot, tract and parcel of land situate, lying and being in Columbus, Muscogee County, Georgia, being known and designated as all of Lot Numbered Sixty (60), Block Lettered "A", Cedar Creek Subdivision, as said lot is shown upon a map or plat entitled "Replat of Lots 6 and 7, Block "A", Cedar Creek, Phase I, Columbus, Muscogee County, Georgia" dated March 15, 1991, prepared by Moon, Meeks & Patrick, Inc., recorded in Plat Book 116, Page 2, in the Office of the Clerk of the Superior Court of Muscogee County, Georgia, to which reference is made for a more specific location and dimensions of said lot.

MR/ske    5/4/10
Our file no. 5796510 - FT11

**THIS IS AN ATTEMPT TO COLLECT A DEBT.   ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

# EXHIBIT "B"

ALL THAT LOT, TRACT OR PARCEL OF LAND SITUATE. LYING AND BEING IN COLUMBUS, MUSCOGEE COUNTY, GEORGIA, AND BEING KNOWN AND BEING KNOWN AND DESIGNATED AS ALL OF LOT NUMBERED SIXTY (60), IN BLOCK LETTERED "A", CEDAR CREEK SUBDIVISION OF LAND KNOWN AS REPLAT OF LOTS 6 AND 7, BLOCK A, CEDAR CREEK, PHASE I, AS SAID LOT IS SHOWN UPON A MAP OR PLAT OF SAID SUBDIVISION RECORDED IN PLAT BOOK 116, PAGE 2, IN THE OFFICE OF THE CLERK OF THE SUPERIOR COURT OF MUSCOGEE COUNTY, GEORGIA, AND REFERENCE  IS MADE TO SAID MAP OR PLAT FOR THE MOST PARTICULAR LOCATION AND DIMENSIONS OF SAID LOT. LOCATED ON SAID PRPERTY IS DWELLING NUMBEED 7372 CEDAR CREEK LOOP, ACCORDING TO THE PRESENT SYSTEM OF NUMBEREING IN MUSCOGEE COUNTY, GEORGIA.

SAID PROPERTY BEING THAT SAME AND IDENTICAL PROPERTY AS DESCRIBED IN THAT CERTAIN WARRANTY DEED FROM JAMES A. HILLIKER TO WENDY N. HILLIKER DATED MAY 2, 2006 AND RECORDED DEED BOOK 8408 AT PAGE 335 IN THE OFFICE OF THE CLERK OF SUPERIOR COURT OF MUSCOGEE COUNTY, GEORGIA.

CFN: 2010013305
FILED IN OFFICE
04/14/2010 12:45PM
DEED Bk: 09973  Pg: 304
M. Linda Pierce
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY

Our File No.: 5796510-FT11
Debtor: Wendy Jenkins
Sale Date: 05/04/2010

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

## ASSIGNMENT

STATE OF

COUNTY OF

     For value received, Mortgage Electronic Registration Systems, Inc. has this day transferred, sold, assigned, conveyed and set over to BAC Home Loans Servicing, LP Fka Countrywide Home Loans Servicing LP , whose address is 177 Countrywide Way, Mail Stop: CAO-911-01-05, Lancaster, CA 93536, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Wendy Jenkins to Mortgage Electronic Registration Systems, Inc., dated July 3, 2008, recorded in Deed Book 09426, Page 33, Muscogee County, Georgia Records.

     Property Address: 7372 Cedar Creek Loop, Columbus, GA 31904

     The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

     The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

     IN WITNESS WHEREOF, the Assignor has hereunto set his hand and seal this February 2, 2010.

Signed, sealed and delivered
in the presence of:

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

_____
Unofficial Witness

By: _____
Printed Name: C. Troy Crouse
Title: Vice President

_____
Notary Public
My Commission Expires:

By: _____
Printed Name: Thomas Sears
Title: Assistant Secretary
(Corporate Seal)



Book: 4869  Page: 174   1 of 18

*McCalla, Raymer Llc*

After recording please return to:

**SUNTRUST MORTGAGE, INC.**
[Company Name]

**RVW 5093**
[Name of Natural Person]

**1001 SEMMES AVENUE**
[Street Address]

**RICHMOND, VIRGINIA 23224**
[City, State Zip Code]

```
Doc ID:   008240120018 Type: GLR
Filed: 08/22/2007 at 03:25:04 PM
Fee Amt: $187.00 Page 1 of 18
Intangible Tax: $141.00
Forsyth County, GA
Douglas Sorrells Clerk Superior Ct
BK 4869 PG 174-191
```

_____ [Space Above This Line For Recording Data] _____

Loan No.: 0206215097

# SECURITY DEED
# (Secondary Lien)

MIN 100010402062150978

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19, and 20.  Certain rules regarding the usage of words used in this document are also provided in Section 15.

**(A)**     "**Security Instrument**" means this document, which is dated July 27, 2007,
together with all Riders to this document.

**(B)**     "**Borrower**" is CHARLES T CROUSE, ECATERINA CROUSE, JOINT TENANTS

.  Borrower is the grantor under this Security Instrument.

**(C)**     "**MERS**" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the grantee under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.

**(D)**     "**Lender**" is SUNTRUST MORTGAGE, INC..
Lender is a corporation organized and existing under the laws of
THE COMMONWEALTH OF VIRGINIA.  Lender's address is 901 SEMMES AVENUE, RICHMOND, VA 23224

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—                        Page 1 of 12          MERS Modified Form 3801 01/01
www.compliancesource.com                                  Modified by "The Compliance Source, Inc." 14182GA 03/02 Rev. 02/04
© 2004, The Compliance Source, Inc.

+ 0 2 0 6 2 1 5 0 9 7 + 0 0 A D + 1 + 1 2

**GEORGIA FORSYTH COUNTY**

I, Greg G. Allen, Clerk Superior Court in and for said county, do hereby certify that this is a true and correct copy of the original that appears on record _____
_Security Deed – Crouse_
_Deed Bk 4869 Pages 174-191_ this office
Given under my official signature and the seal of said Court, this _3rd_ day of _May_ 20 _10_
By: _Anna Coker_ _____ Deputy Clerk
Forsyth Superior Court

**SATISFIED AND CANCELLED**

JUL 13 2009

SEE BOOK _5426_ PAGE _239_
FORSYTH COUNTY, GA
GREG G. ALLEN
CLERK OF SUPERIOR COURT

(E)   **"Note"** means the promissory note signed by Borrower and dated **July 27, 2007**.
The Note states that Borrower owes Lender  **Forty Six Thousand Eight Hundred  and 00/100ths** Dollars (U.S.
**$46,800.00**) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt
in full not later than **August 1, 2037**.

(F)   **"Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

(G)   **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, if allowed under Applicable Law, and all sums due under this Security Instrument, plus interest.

(H)   **"Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following
Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Home Improvement Rider | ☐ Revocable Trust Rider | ☒ Rider to the Security Deed |
| ☐ Other(s) *[specify]* | | |

(I)   **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.

(J)   **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association or
similar organization.

(K)   **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer,
or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

(L)   **"Escrow Items"** means those items that are described in Section 3.

(M)   **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to,
or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance
in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)   **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

(O)   **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—                    Page 2 of 12
www.compliancesource.com

MERS Modified Form 3801 01/01
Modified By "The Compliance Source, Inc." 14302GA 03/02 Rev. 08/06
© 2004, The Compliance Source, Inc.

**(P)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the COUNTY of FORSYTH:

[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

**SEE ATTACHED SCHEDULE A**

which currently has the address of **4510 BELLMONT DRIVE**
[Street]
**CUMMING**                , Georgia **30040**                ("Property Address"):
[City]                [Zip Code]

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—        Page 3 of 12        MERS Modified Form 3801 01/01
www.compliancesource.com        © 2004, The Compliance Source, Inc.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

**1.   Payment of Principal, Interest and Other Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and if allowable under Applicable Law, any prepayment charges and late charges due under the Note.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

**2.   Application of Payments or Proceeds.**  Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14 or in such manner or location as required under Applicable Law.  Except as otherwise described in this Section 2, and as permitted under Applicable Law, all payments accepted and applied by Lender shall be applied as set forth in the Note and then for any amounts due under Section 3.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  To the extent permitted by Applicable Law, voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.   Funds for Escrow Items.**  Unless required by Lender, Borrower shall not be required to pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property;  (b) leasehold payments or ground rents on the Property, if any;  (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall not pay Lender the Funds for Escrow Items unless Lender notifies Borrower of Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 8.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 8 and pay such amount and Borrower shall then be obligated under Section 8 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under



+ 0 2 0 8 2 1 5 0 9 7 + 0 0 A D + 4 + 1 2

CTC
8C

RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior security agreement if such holder is an institutional lender. If under Section 21 the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

4.   Charges; Liens.  Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument.  Borrower shall pay when due, all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien other than a lien disclosed to Lender in Borrower's application or in any title report Lender obtained which has priority over this Security Instrument unless Borrower:  (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan if allowed under Applicable Law.

5.   Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—                                    Page 5 of 12
www.compliancesource.com

MERS Modified Form 3801 01/01
Modified By "The Compliance Source, Inc." 14182GA 03/02 Rev. 06/06
© 2004, The Compliance Source, Inc.



CR
EC

responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5, shall be added to the unpaid balance of the loan and interest shall accrue at the Note rate, from the time it was added to the unpaid balance until it is paid in full.

Subject to Applicable Law, all insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage, or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—                    Page 6 of 12
www.compliancesource.com

MERS Modified Form 3801 01/01
Modified By "The Compliance Source, Inc." 14163GA 02/02 Rev. 10/04
© 2004, The Compliance Source, Inc.



+ 0 2 0 6 2 1 5 0 9 7 + 0 0 A D + 6 + 1 2

C 7C
6C

are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

7.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

8.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which has or may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has or may attain priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument if allowed under Applicable Law. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

9.  **Mortgage Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.

10.  **Assignment of Miscellaneous Proceeds; Forfeiture.** The Miscellaneous Proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 7 of 12

MERS Modified Form 3881 01/01
Modified By "The Compliance Source, Inc." 14182GA 03/02 Rev. 08/05
© 2004, The Compliance Source, Inc.



+ 0 2 0 6 2 1 5 0 9 7 + 0 0 A D + 7 + 1 2

Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, as allowed under Applicable Law. The absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the

+ 0 2 0 6 2 1 5 0 9 7 + 0 0 A D + 8 + 1 2

permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment.

14. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

15. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

16. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, as allowed under Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 9 of 12

MERS Modified Form 3801 01/01
Modified By "The Compliance Source, Inc." 14182GA 03/02 Rev. 08/06
© 2004, The Compliance Source, Inc.



+ 0 2 0 6 2 1 5 0 9 7 + 0 0 A D + 9 + 1 2

by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, if required under Applicable Law, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this section . The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20. Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance,



+ 0 2 0 6 2 1 5 0 9 7 + 0 0 A D + 1 0 + 1 2

CR
6C

and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in the Note or this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law. If the Property is sold pursuant to this Section 21, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

23. Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

24. Assumption Not a Novation. Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

25. Security Deed. This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

REQUEST FOR NOTICE OF DEFAULT

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 11 of 12
MERS Modified Form 3801 01/01
Modified by "The Compliance Source, Inc." 14152GA 03/02 Rev. 09/05
© 2004, The Compliance Source, Inc.

**AND FORECLOSURE UNDER SUPERIOR
SECURITY DEEDS, MORTGAGES OR DEEDS OF TRUST**

Borrower and Lender request the holder of any security deed, mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to Lender, at Lender's address set forth on page one of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

_____[Signatures on Following Page]_____

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, sealed and delivered in the presence of:

_____     _____ (Seal)
Unofficial Witness                                    **CHARLES T CROUSE**                    -Borrower

                                                      Mailing Address
                                                      **4645 VALAIS COURT UNIT 27,**
                                                      **ALPHARETTA, GA 30022**
_____     _____ (Seal)
Notary Public                                         **ECATERINA CROUSE**                   -Borrower
My Commission Expires:

_____     Mailing Address
County

                                                      _____ (Seal)
                                                                                            -Borrower

                                                      Mailing Address

                                                      _____ (Seal)
                                                                                            -Borrower

                                                      Mailing Address

---

Georgia Security Deed–Single Family–Secondary Lien
—THE COMPLIANCE SOURCE, INC.—                    Page 12 of 12          MERS Modified Form 3801 01/01
www.compliancesource.com                                              Modified By "The Compliance Source, Inc." 14182GA 02/02 Rev. 02/04
                                                                                            © 2004, The Compliance Source, Inc.

+ 0 2 0 6 2 1 5 0 9 7 + 0 0 A D + 1 2 + 1 2

Loan No.: 0206215097

# PLANNED UNIT DEVELOPMENT RIDER
## (Secondary Lien)

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 27th day of July, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to SUNTRUST MORTGAGE, INC. (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**4510 BELLMONT DRIVE, CUMMING, GA 30040**

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). The Property is a part of a planned unit development known as:

**SWEETBRIAR**

*[Name of Planned Unit Development]*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  PUD Obligations.**  Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association.  Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B.  Property Insurance.**  So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Multistate PUD Rider — (Secondary Lien)
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 1 of 3

Modified Form 3150 01/01
Modified by "The Compliance Source, Inc." 68549887 07/03
©2003, The Compliance Source, Inc.

+ 0 2 0 6 2 1 5 0 9 7 + 0 0 C D + 1 + 3

hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i)  Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii)  Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender.  Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C.  **Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D.  **Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.  Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 10.

E.  **Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i)  the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii)  any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii)  termination of professional management and assumption of self-management of the Owners Association; or (iv)  any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F.  **Remedies.**  If Borrower does not pay PUD dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Multistate PUD Rider — (Secondary Lien)
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 2 of 3

Modified Form 3150 01/01
Modified by "The Compliance Source, Inc." 665469MU 07/03
©2003, The Compliance Source, Inc.



```
+ 0 2 0 6 2 1 5 0 9 7 + 0 0 C D + 2 + 3
```

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.



_____ (Seal)    _____ (Seal)
**CHARLES T CROUSE**            -Borrower    **ECATERINA CROUSE**           -Borrower

_____ (Seal)    _____ (Seal)
                                -Borrower                                   -Borrower

*[Sign Original Only]*

Multistate PUD Rider — (Secondary Lien)
—THE COMPLIANCE SOURCE, INC.—                          Page 3 of 3
www.compliancesource.com

Modified Form 3150 01/01
Modified by "The Compliance Source, Inc." 05049MU 07/03
©2003, The Compliance Source, Inc.

+ 0 2 0 6 2 1 5 0 9 7 + 0 0 C D + 3 + 3

Loan No.: 0206215097

MIN: 100010402062150978

# GEORGIA
# RIDER TO THE SECURITY DEED

This Rider is deemed to amend and supplement the Security Instrument given by Borrower that secures Borrower's Note to Lender and covering the property described in the Security Instrument.

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Acknowledgement and Waiver of Borrower's Rights.   By execution of this paragraph, Borrower expressly: (1) acknowledges the Right to Accelerate the Debt and the Power of Attorney given herein to Lender to sell the property by nonjudicial foreclosure upon default by Borrower without any judicial hearing and without any notice other than such notice as is required to be given under the provisions hereof; (2) waives any and all rights which Borrower may have under the Fifth and Fourteenth Amendments to the Constitution of the United States, the various provisions of the Constitution for the several states, or any other applicable law to notice and to judicial hearing prior to the exercise by Lender of any right or remedy herein provided to Lender, except such notice as is specifically required to be provided hereof; (3) acknowledges that Borrower has read this Security Instrument and specifically this paragraph and any and all questions regarding the legal effect of the Security Instrument and its provisions have been explained fully to Borrower and Borrower has been afforded an opportunity to consult with counsel of Borrower's choice prior to executing this Security Instrument; (4) acknowledges that all waivers of the aforesaid rights of Borrower have been made knowingly, intentionally and willingly by Borrower as part of a bargained for loan transaction; and (5) agrees that the provisions hereof are incorporated into and made a part of the Security Instrument.

Georgia Rider to the Security Deed
—THE COMPLIANCE SOURCE, INC.—            Page 1 of 2                   04901GA 07/99 Rev. 02/2000
www.compliancesource.com                                            ©2003, The Compliance Source, Inc.

+ 0 2 0 6 2 1 5 0 9 7 + 0 0 C A + 1 + 2

CR
6C

READ AND AGREED BY BORROWER:

_____ (Seal)
CHARLES T CROUSE          -Borrower

_____ (Seal)
ECATERINA CROUSE          -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

*[Sign Original Only]*

Exhibit A

All that tract or parcel of land lying and being in Land Lots 1087, 1088, and 1146, 3rd
District,  1st Section of Forsyth County, Georgia, being Lot 37, Sweetbriar, Phase One, as
per plat recorded in Plat Book 37, Pages 291-292, Forsyth County, Georgia Records,
which plat is incorporated herein by reference.

2009166424   DEED BOOK **21655** Pg **566**

Filed and Recorded:
9/21/2009 2:59:30 PM
Linda Carter
Clerk of Superior Court
DeKalb County, Georgia

Our File No.: 52655407-FT4
Debtor: Lenora Yvette Sadler
Sale Date: 10/06/2009

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

### ASSIGNMENT

STATE OF

COUNTY OF

For value received, Mortgage Electronic Registration Systems, Inc has this day transferred, sold, assigned, conveyed and set over to BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing LP , whose address is 5401 North Beach Street, MS FWTX-35, Fort Worth, TX 76137, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Lenora Yvette Sadler to Mortgage Electronic Registration Systems, Inc., dated February 28, 2007, recorded in Deed Book 19714, Page 795, DeKalb County, Georgia Records.

Property Address: 1053 Thornwoode Lane, Stone Mountain, GA 30083

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this March 15, 2009.

Signed, sealed and delivered
in the presence of

_____
Unofficial Witness

_____
Notary Public
My Commission Expires:

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC

By:_____
Printed Name: Troy Crouse
Title: Vice President
By:_____
Printed Name: Thomas A. Sears
Title: Assistant Secretary
(Corporate Seal))



BK 49562 PG 0626

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA.

2009 JUN 26  PM 3: 53

TOM LAWLER, CLERK

308926

Our File No.: 5871509-FT4
Debtor: Jay Kim
Sale Date: 07/07/2009

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

## ASSIGNMENT

STATE OF

COUNTY OF

For value received, Mortgage Electronic Registration Systems, Inc. has this day transferred, sold, assigned, conveyed and set over to BAC Home Loans Servicing LP fka Countrywide Home Loans Servicing LP, whose address is 2270 Lakeside Blvd, Richardson, TX 75082, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Jay Kim to Mortgage Electronic Registration Systems, Inc., dated March 27, 2006, recorded in Deed Book 46316, Page 366, Gwinnett County,  Georgia Records.

Property Address: 5014 Pacific Dunes Dr, Suwanee, GA 30024

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this April 4, 2009.

Signed, sealed and delivered
in the presence of:

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

Unofficial Witness

Notary Public
My Commission Expires:

By:_____
Printed Name: C. Troy Crouse
Title: Assistant Secretary

By:_____
Printed Name: Thomas Sears
Title: Vice President

ELIZABETH LOFARO
NOTARY
EXPIRES
GEORGIA
MAY 27, 2013
PUBLIC
FORSYTH COUNTY

0058233

7

2009166403   DEED BOOK **21655** Pg **545**

Filed and Recorded:
9/21/2009 2:59:38 PM
Linda Carter
Clerk of Superior Court
DeKalb County, Georgia

Our File No.: 52137109-FT5
Debtor: Pharlene Thesatus
Sale Date: 10/06/2009

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

## ASSIGNMENT

STATE OF

COUNTY OF

    For value received, Mortgage Electronic Registration Systems, Inc has this day transferred, sold, assigned, conveyed and set over to Wells Fargo Bank NA, whose address is PO Box 10335, Des Moines, IA 50306, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Pharlene Thesatus to Mortgage Electronic Registration Systems, Inc., dated September 9, 2008, recorded in Deed Book 21068, Page 42, DeKalb County, Georgia Records.

    Property Address: 4069 Sweetwater Parkway, Ellenwood, GA 30294

    The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

    The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

    IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this June 22, 2009.

Signed, sealed and delivered
in the presence of:

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC

_____
Unofficial Witness

By:_____
Printed Name: Tom Sears
Title: Vice President

_____
Notary Public
My Commission Expires:

By:_____
Printed Name: Troy Crouse
Title: Assistant Secretary
(Corporate Seal)

Deed Book 48644 Pg 326
Filed and Recorded Dec-22-2009 01:44pm
2009-0381247
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

Loan No.: 1293038160
Our File No.: 52818609-FT3
Debtor: Richard A Hampson A/K/A Richard Allen Hampson
Sale Date: 01/05/2010

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

## ASSIGNMENT

STATE OF GEORGIA

COUNTY OF FULTON

For value received, Mortgage Electronic Registration Systems, Inc. has this day transferred, sold, assigned, conveyed and set over to Chase Home Finance LLC, whose address is 3415 Vision Drive, Columbus, OH 43219, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Richard A Hampson A/K/A Richard Allen Hampson to Mortgage Electronic Registration Systems, Inc., dated December 27, 2002, recorded in Deed Book 34045, Page 647, Fulton County, Georgia Records.

Property Address: 10165 North Coleman Road, Roswell, GA 30075

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this October 3, 2009.

Signed, sealed and delivered
in the presence of:

Unofficial Witness

Notary Public
My Commission Expires:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By: _____
Printed Name: C. Trey Crouse
Title: _____

By: _____
Printed Name: Thomas Sears
Title: _____
(Corporate Seal)

VICTORIA MARIE ALLEN
NOTARY
EXPIRES
GEORGIA
OCT. 15, 2013
PUBLIC
FULTON COUNTY

BK49366PG0092

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA.

2009 MAR 23. AM 11:06

TOM LAWLER, CLERK

**303996**

Our File No.: 11858608-FT5
Debtor: Gil S. Lee
Sale Date: 04/07/2009

Return to
Prommis Solutions, LLC
  1544 Old Alabama Road
Roswell, GA 30076

ASSIGNMENT

STATE OF

COUNTY OF

For value received, Mortgage Electronic Registration Systems, Inc. has this day transferred, sold, assigned, conveyed and set over to Wells Fargo Bank, N.A., whose address is PO Box 10328, Des Moines, IA 50306-0328, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Gil S. Lee to Mortgage Electronic Registration Systems, Inc., dated February 14, 2003, recorded in Deed Book 31185, Page 157, Gwinnett County, Georgia Records.

Property Address: 364 Ambrose Creek Drive, Sugar Hill, GA 30518

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this November 29, 2008.

Signed, sealed and delivered
in the presence of:

Unofficial Witness

Notary Public
My Commission Expires:

**0024594**

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By:
Printed Name: C. Troy Crouse
Title: Vice President

By:
Printed Name: Thomas Sears
Title: Assistant Secretary
(Corporate Seal)

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY. GA.

2008 OCT 29  AM 10: 50

TOM LAWLER. CLERK

312615

Our File No.: 5273308-FTS
Debtor: Alvin Taylor
Sale Date: 11/04/2008

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

## ASSIGNMENT

STATE OF GEORGIA

COUNTY OF GWINNETT

For value received, Wells Fargo Bank, N.A. has this day transferred, sold, assigned, conveyed and set over to Midfirst Bank, whose address is PO Box 10335, Des Moines, IA 50306, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Alvin Taylor to Mortgage Electronic Registration Systems, Inc., dated May 14, 2004, recorded in Deed Book 38324, Page 140, Gwinnett County, Georgia Records.

Property Address: 2377 Redfield Drive, Norcross, GA 30071-4324

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this May 16, 2008.

Signed, sealed and delivered
in the presence of:

WELLS FARGO BANK, N.A.

Unofficial Witness

By: _____

Title:_ Vice President of Loan
Documentation

Notary Public
My Commission Expires:

By: _____

Title:_ Vice President of Loan
Documentation
(Corporate Seal)

0106714

BK49007PG0250

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY. GA.

2008 AUG -4 PM 12:41

TOM LAWLER. CLERK

307971

Our File No.: 51065308-FT4
Debtor:  Delores Jones
Sale Date:  08/05/2008

Return to
Prommis Solutions, LLC
   1544 Old Alabama Road
Roswell, GA 30076

## ASSIGNMENT

STATE OF

COUNTY OF

For value received, Mortgage Electronic Registration Systems, Inc. has this day transferred, sold, assigned, conveyed and set over to BANK OF NEW YORK, AS TRUSTEE, ON BEHALF OF THE CERTIFICATEHOLDERS , whose address is 7105 Corporate Drive, Mail Stop PTX-C-35, Plano, TX 75024, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Delores Jones to Mortgage Electronic Registration Systems, Inc., dated November 23, 2004, recorded in Deed Book 40782, Page 120, Gwinnett County, Georgia Records.

Property Address: 1043 Mosscroft Ct, Lawrenceville, GA 30045

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, test the Assignor has hereunto set its hand and seal this April 5, 2008.

Signed, sealed and delivered
in the presence of:

Unofficial Witness

Notary Public
My Commission Ex

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By: _____

Title: Asst. Secretary

By: _____

Title: Vice President
(Corporate Seal)          **0079988**

**0079988**

Deed Book **14703** Pg **2679**
Filed and Recorded Jun-23-2009 09:49am
**2009-0082816**

*JyC.Stephenson*

Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

Our File No.: 51286309-FTS
Debtor: Eleanor Spratlin
Sale Date: 07/07/2009

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

## ASSIGNMENT

STATE OF

COUNTY OF

For value received, Mortgage Electronic Registration Systems, Inc. has this day transferred, sold, assigned, conveyed and set over to Wells Fargo Bank, N.A. dba America's Servicing Company, whose address is PO Box 10328, Des Moines, IA 50306-0328, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Eleanor Spratlin to Mortgage Electronic Registration Systems, Inc., dated December 1, 2006, recorded in Deed Book 14426, Page 6267, Cobb County, Georgia Records.

Property Address: 3149 Saddleback Mt Rd, Marietta, GA 30062

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this April 4, 2009.

Signed, sealed and delivered
in the presence of:

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

Unofficial Witness

By: _____
Printed Name: C. Troy Crouse
Title: Assistant Secretary

Notary Public
My Commission Expires:

By: _____
Printed Name: Thomas Sears
Title: Vice President
(Corporate Seal)

Deed Book 14886 Pg 172
Filed and Recorded Oct-19-2010 12:45pm
2010-0138802

*Jay C. Stephenson*
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

Return to:
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

Our File No.: 51286309-FT12
Debtor: Eleanor Lynn Spratlin AKA Eleanor Spratlin

CLERK: Please Cross-Reference
to Security Deed Recorded at Deed
Book 14426, Page 6267, Cobb
County Georgia Records, and
Assignment recorded at Deed Book
14703, Page 2679, Cobb County,
Georgia Records

AMENDED ASSIGNMENT

STATE OF GEORGIA

COUNTY OF FULTON

For value received, Mortgage Electronic Registration Systems, Inc. has transferred, sold, assigned, conveyed and set over to Wells Fargo Bank, NA dba America's Servicing Company, whose address is PO Box 10328, Des Moines, IA 50306-0328, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Eleanor Lynn Spratlin AKA Eleanor Spratlin to Mortgage Electronic Registration Systems, Inc., dated December 1, 2006, recorded in Deed Book 14426, Page 6267, Cobb County, Georgia Records.

Property Address: 3149 Saddleback Mt Rd, Marietta, GA 30062

The Assignor herein has specifically transferred, sold, conveyed and assigned to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer was made to secure the Assignee, its successors, representatives and assigns, in the payment of said note on September 1, 2007. This Amended Assignment supersedes and replaces the Assignment recorded on June 23, 2009 at Deed Book 14703, Page 2679 at the Cobb County, Georgia real property records.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this 15th day of October, 2010.

Signed, sealed and delivered
in the presence of:

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

Unofficial Witness

By: _____
Printed Name: ___C TROY CROUSE___
Title: ___VICE PRESIDENT___

Notary Public
My Commission Expires:

By: _____
Printed Name: ___THOMAS SEARS___
Title: ___ASSISTANT SECRETARY___
(Corporate Seal)

DANIELLA M. PIPER
NOTARY
EXPIRES
GEORGIA
APRIL 12, 2014
PUBLIC
GWINNETT COUNTY

## AGREEMENT FOR SIGNING AUTHORITY

**MERSCORP, INC.** ("MERS") and its subsidiary, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., Bank of America, N.A. (#1000255)** ("MEMBER") and **McCalla Raymer, LLC** ("VENDOR") hereby agree as follows:

1.  The purpose of this agreement for signing authority (the "Agreement") is to define the rights and obligations of the parties when Vendor performs certain duties, as described in the attached corporate resolution (the "Resolution"), relating to mortgage loans that are registered on the MERS® System and shown on the MERS® System to be serviced by Member.

2.  **Bank of America, N.A.** is a member of MERS, and has signed an agreement of membership that is incorporated herein by reference. Member has entered into a separate contract with Vendor to perform certain services for Member. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust, respectively, and any other form of security instrument under applicable state law.

3.  The parties acknowledge that Mortgage Electronic Registration Systems, Inc. may be the mortgagee of record on Member's mortgages. Therefore, in order for Vendor to perform its contractual duties to Member, MERS, by corporate resolution, will grant employees of Vendor the limited authority to act on behalf of MERS to perform certain duties. Such authority is set forth in the Resolution, which is made a part of this Agreement.

4.  The parties agree that Member will provide all necessary information and instructions to Vendor to perform certain duties where Mortgage Electronic Registration Systems, Inc. acts as the mortgagee of record. All parties agree that MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. are not responsible for the accuracy of any information provided by Member to Vendor, or any information entered into the MERS® System by or on behalf of Member. Any problems regarding the information or instructions between Member and Vendor must be resolved between those two parties.

5.  Member and Vendor agree to indemnify and hold harmless MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc. and any employee, director, officer, agent or affiliate of MERSCORP, Inc. or Mortgage Electronic Registration Systems, Inc. ("MERS Party") from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses that result from the negligence, errors and omissions, breach of confidentiality or willful misconduct of Vendor in performing certain duties where Mortgage Electronic Registration Systems, Inc. is the mortgagee of record.

6.  Vendor shall maintain appropriate insurance coverage that shall include coverage for any negligence, errors and omissions or willful misconduct of all employees authorized to sign as officers of Mortgage Electronic Registration Systems, Inc.



7. Upon termination of the contract between Member and Vendor, this agreement shall concurrently terminate and the corporate resolution shall be revoked at such time.

8. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

The parties have executed this Agreement intending to be bound as of the dates indicated below.

**MERSCORP, INC.**

By: _SHARON M. HORSTKAMP_
    VICE PRESIDENT

Title: _Vice President_

Dated: _4/21/10_

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

By: _WILLIAM C. HULTMAN_
    SECRETARY/TREASURER

Title: _Secretary/Treasurer_

Dated: _4/21/10_

**Bank of America, N.A.**

By: _____

Title: _Vice President_

Dated: _4/5/10_

**McCalla Raymer, LLC**

By: _Michael J. McGraw_

Title: _Managing Partner, Bankruptcy Department_

Dated: _03/15/2010_

## MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

## CORPORATE RESOLUTION

Be it Resolved that the attached list of candidates are employee(s) of **McCalla Raymer, LLC** and are hereby appointed as assistant secretaries and vice presidents of Mortgage Electronic Registration Systems, Inc., and as such, are authorized to:

Execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that is shown to be registered to the Member, including but not limited to (a) substitution of trustee on Deeds of Trust, (b) Trustee's Deeds upon sale on behalf of MERS, (c) Affidavits of Non-military Status, (d) Affidavits of Judgment, (e) Affidavits of Debt, (f) quitclaim deeds, (g) Affidavits regarding lost promissory notes, and (h) endorsements of promissory notes to VA or HUD on behalf of MERS as a required part of the claims process;

Assign the lien of any mortgage loan registered on the MERS® System that is shown to be registered to **Bank of America, N.A.** or its designee.

I, William C. Hultman, being the Corporate Secretary of Mortgage Electronic Registration Systems, Inc., hereby certify that the foregoing is a true copy of a Resolution duly adopted by the Board of Directors of said corporation effective as of the _21_ day of _April_ , 2009, which is in full force and effect on this date and does not conflict with the Certificate of Incorporation or By-Laws of said corporation.

Secretary    WILLIAM C. HULTMAN
SECRETARY/TREASURER

**McCalla Raymer, LLC**
(for Bank of America, N.A. #1000255)

## Mortgage Electronic Registration Systems, Inc.
## Certifying Officers
(effective 4/21/10 )

C. Troy Crouse

Thomas Sears

Michael Allgood

Joshua Greene

Adam Silver

Melody Jones

Robert Chastain

Michael J. McCormick

A. Michelle Hart

Maria Tsagaris

Felicia LeRay

Deborah Conley

Jeanne Morton

Lureece Lewis

Anthony Maselli

Melissa Sawyers

Ryan Finch

# AGREEMENT FOR SIGNING AUTHORITY

**MERSCORP, INC.** ("MERS") and its subsidiary, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., BAC Home Loans Servicing, LP** ("MEMBER") and **McCalla Raymer, LLC** ("VENDOR") hereby agree as follows:

1. The purpose of this agreement for signing authority (the "Agreement") is to define the rights and obligations of the parties when Vendor performs certain duties, as described in the attached corporate resolution (the "Resolution"), relating to mortgage loans that are registered on the MERS® System and shown on the MERS® System to be serviced by Member.

2. **BAC Home Loans Servicing, LP** is a member of MERS, and has signed an agreement of membership that is incorporated herein by reference. Member has entered into a separate contract with Vendor to perform certain services for Member. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust, respectively, and any other form of security instrument under applicable state law.

3. The parties acknowledge that Mortgage Electronic Registration Systems, Inc. may be the mortgagee of record on Member's mortgages. Therefore, in order for Vendor to perform its contractual duties to Member, MERS, by corporate resolution, will grant employees of Vendor the limited authority to act on behalf of MERS to perform certain duties. Such authority is set forth in the Resolution, which is made a part of this Agreement.

4. The parties agree that Member will provide all necessary information and instructions to Vendor to perform certain duties where Mortgage Electronic Registration Systems, Inc. acts as the mortgagee of record. All parties agree that MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. are not responsible for the accuracy of any information provided by Member to Vendor, or any information entered into the MERS® System by or on behalf of Member. Any problems regarding the information or instructions between Member and Vendor must be resolved between those two parties.

5. Member and Vendor agree to indemnify and hold harmless MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc. and any employee, director, officer, agent or affiliate of MERSCORP, Inc. or Mortgage Electronic Registration Systems, Inc. ("MERS Party") from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses that result from the negligence, errors and omissions, breach of confidentiality or willful misconduct of Vendor in performing certain duties where Mortgage Electronic Registration Systems, Inc. is the mortgagee of record.

6. Vendor shall maintain appropriate insurance coverage that shall include coverage for any negligence, errors and omissions or willful misconduct of all employees authorized to sign as officers of Mortgage Electronic Registration Systems, Inc.

7. Upon termination of the contract between Member and Vendor, this agreement shall concurrently terminate and the corporate resolution shall be revoked at such time.

8. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

The parties have executed this Agreement intending to be bound as of the dates indicated below.

**MERSCORP, INC.**

By: _____
     SHARON M. HORSTKAMP
     VICE PRESIDENT

Title: Vice President

Dated: 4/26/10

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

By: _____
     WILLIAM C. HULTMAN
     SECRETARY/TREASURER

Title: Secretary/Treasurer

Dated: 4/26/10

**BAC Home Loans Servicing, LP**

By: _____

Title: Vice President

Dated: 4/5/10

**McCulla Raymer, LLC**

By: Michael J. McCormick

Title: Managing Partner, Bankruptcy Department

Dated: 03/15/2010

## MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

## CORPORATE RESOLUTION

Be it Resolved that the attached list of candidates are employee(s) of **McCalla Raymer, LLC** and are hereby appointed as assistant secretaries and vice presidents of Mortgage Electronic Registration Systems, Inc., and as such, are authorized to:

Execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that is shown to be registered to the Member, including but not limited to (a) substitution of trustee on Deeds of Trust, (b) Trustee's Deeds upon sale on behalf of MERS, (c) Affidavits of Non-military Status, (d) Affidavits of Judgment, (e) Affidavits of Debt, (f) quitclaim deeds, (g) Affidavits regarding lost promissory notes, and (h) endorsements of promissory notes to VA or HUD on behalf of MERS as a required part of the claims process;

Assign the lien of any mortgage loan registered on the MERS® System that is shown to be registered to **BAC Home Loans Servicing, LP** or its designee.

I, William C. Hultman, being the Corporate Secretary of Mortgage Electronic Registration Systems, Inc., hereby certify that the foregoing is a true copy of a Resolution duly adopted by the Board of Directors of said corporation effective as of the 4ι day of Npn , 2009, 2010, which is in full force and effect on this date and does not conflict with the Certificate of Incorporation or By-Laws of said corporation.

Secretary   WILLIAM C. HULTMAN
            SECRETARY/TREASURER

**McCalla Raymer, LLC**
(for BAC Home Loans Servicing, LP #1000157)

## Mortgage Electronic Registration Systems, Inc.
### Certifying Officers
(effective 4/2u/10  )

Adam Silver

Robert Michael Sheffield

Thomas Sears

Joshua Greene

Michael Allgood

Melody Jones

C. Troy Crouse

Michael J. McCormick

A. Michelle Hart

Maria Tsagaris

Felicia LeRay

Deborah Conley

Jeanne Morton

Lureece Lewis

Anthony Maselli

Melissa Sawyers

Ryan Finch

## AGREEMENT FOR SIGNING AUTHORITY

MERSCORP, INC. ("MERS") and its subsidiary, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., Countrywide Financial Corporation ("MEMBER")** and McCalla Raymer, LLC ("VENDOR") hereby agree as follows:

1. The purpose of this agreement for signing authority (the "Agreement") is to define the rights and obligations of the parties when Vendor performs certain duties, as described in the attached corporate resolution (the "Resolution"), relating to mortgage loans that are registered on the MERS® System and shown on the MERS® System to be serviced by Member.

2. **Countrywide Financial Corporation** is a member of MERS, and has signed an agreement of membership that is incorporated herein by reference. Member has entered into a separate contract with Vendor to perform certain services for Member. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust, respectively, and any other form of security instrument under applicable state law.

3. The parties acknowledge that Mortgage Electronic Registration Systems, Inc. may be the mortgagee of record on Member's mortgages. Therefore, in order for Vendor to perform its contractual duties to Member, MERS, by corporate resolution, will grant employees of Vendor the limited authority to act on behalf of MERS to perform certain duties. Such authority is set forth in the Resolution, which is made a part of this Agreement.

4. The parties agree that Member will provide all necessary information and instructions to Vendor to perform certain duties where Mortgage Electronic Registration Systems, Inc. acts as the mortgagee of record. All parties agree that Merscorp, Inc. and Mortgage Electronic Registration Systems, Inc. are not responsible for the accuracy of any information provided by Member to Vendor, or any information entered into the MERS® System by or on behalf of Member. Any problems regarding the information or instructions between Member and Vendor must be resolved between those two parties.

5. Member and Vendor agree to indemnify and hold harmless Merscorp, Inc., Mortgage Electronic Registration Systems, Inc. and any employee, director, officer, agent or affiliate of Merscorp, Inc. or Mortgage Electronic Registration Systems, Inc. ("MERS Party") from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses that result from the negligence, errors and omissions, breach of confidentiality or willful misconduct of Vendor in performing certain duties where Mortgage Electronic Registration Systems, Inc. is the mortgagee of record.

6. Vendor shall maintain appropriate insurance coverage that shall include coverage for any negligence, errors and omissions or willful misconduct of all employees authorized to sign as officers of Mortgage Electronic Registration Systems, Inc.

7. Upon termination of the contract between Member and Vendor, this agreement shall concurrently terminate and the corporate resolution shall be revoked at such time.

8. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

The parties have executed this Agreement intending to be bound as of the dates indicated below.

**MERSCORP, INC.**

By: _____

Title: __Vice President__

Dated: _____10-16-07_____

**MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.**

By: _____

Title: ____Secretary/Treasurer____

Dated: _____10-16-07_____

__Countrywide Financial Corporation__

By: _____

Title: __SVP, Foreclosure/BK Mgmt.__

Dated: __September 14, 2007__

__McCalla Raymer, LLC__

By: _____

Title: ____attorney____

Dated: __19 September 2007__

## MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

### CORPORATE RESOLUTION

Be it Resolved that the attached list of candidates are employee(s) of **McCalla Raymer, LLC** and are hereby appointed as assistant secretaries and vice presidents of Mortgage Electronic Registration Systems, Inc., and as such, are authorized to:

(1) Assign the lien of any mortgage loan registered on the MERS® System that is shown to be registered to **Countrywide Financial Corporation** or its designee;

(2) Release the lien of any mortgage loan registered on the MERS® System that is shown to be registered to **Countrywide Financial Corporation** or its designee;

(3) execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that is shown to be registered to the Member, including but not limited to (a) substitution of trustee on Deeds of Trust, (b) Trustee's Deeds upon sale on behalf of MERS, (c) Affidavits of Non-military Status, (d) Affidavits of Judgment, (e) Affidavits of Debt, (f) quitclaim deeds, (g) Affidavits regarding lost promissory notes, and (h) endorsements of promissory notes to VA or HUD on behalf of MERS as a required part of the claims process.

I, William C. Hultman, being the Corporate Secretary of Mortgage Electronic Registration Systems, Inc., hereby certify that the foregoing is a true copy of a Resolution duly adopted by the Board of Directors of said corporation effective as of the 16 day of october, 2007 which is in full force and effect on this date and does not conflict with the Certificate of Incorporation or By-Laws of said corporation.

_____
Secretary

McCalla Raymer, LLC

## Mortgage Electronic Registration Systems, Inc.
## Certifying Officers

C. Troy Crouse

Thomas Sears

Tenisa Cook

Adam Silver

Robert Michael Sheffield



Home Page | Contact Us | Location | Privacy Policy | Site Map

**Newsroom | About Us | Events | Why MERS? | Knowledge Base | Careers**

| **Tools & Services** | **MERS** Products ▸ | **MERS**® System | **MERS**® Link | **MERS**® 1-2-3 | **MERS**® Commercial |
|---|---|---|---|---|---|
| Downloads | | **MERS**® eRegistry | **MERS**® eDelivery | **MERS**® ServicerID | **MERS**® iSearch |
| Member Directory | | **MERS** Fraud Tools | Mass.Gov Div. of Banks | **MISMO**® | **MERS**® FraudALERT |

Home » About Us › Shareholders

## MERS Shareholders

Shareholders played a critical role in the development of MERS. Through their capital support, MERS was able to fund expenses related to development and initial start-up.

The following organizations are Shareholders of MERS.

Foreclosures

Enhancements

Forum

Advertising

Payment Options

**MERS for Homeowners**

**Property Preservation Contacts**

📞**Contact Us**



 American Land Title Association

 Bank of America

🌀 CCO Mortgage  CCO Mortgage Corporation

CHASE  Chase Home Mortgage Corporation of the Southeast

citimortgage  CitiMortgage, Inc.

 Commercial Mortgage Securities Association



 Corinthian Mortgage Corporation

 EverHome Mortgage Company

 Fannie Mae

 First American Title Insurance Corporation

 Freddie Mac

 GMAC Residential Funding Corporation

 Guaranty Bank

 HSBC Finance Corporation

 Merrill Lynch Credit Corporation

 MGIC Investor Services Corporation

 Mortgage Bankers Association

 Nationwide Advantage Mortgage Company

 PMI Mortgage Insurance Company

 Stewart Title Guaranty Company

 SunTrust Morgage, Inc.

 United Guaranty Corporation

 Washington Mutual Bank

Wells Fargo Bank, N.A.

 WMC Mortgage Corporation

TOP

Home Page | Contact Us | Location | Privacy Policy | Site Map

Copyright© 2010 by MERSCORP, Inc. 1-800-646-MERS (6377)
Other products or company names are or may be trademarks or registered trademarks and are the property of their respective holders.